## CHISOM ET AL. v. ROEMER, GOVERNOR OF LOUISIANA, ET AL.

No. 90–757.   Argued April 22, 1991—Decided June 20, 1991*

---

*Together with No. 90–1032, *United States* v. *Roemer, Governor of Louisiana, et al.*, also on certiorari to the same court.

*Solicitor General Starr* argued the cause for the United States in No. 90–1032. With him on the briefs were *Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Clegg, Paul J. Larkin, Jr., Jessica Dunsay Silver,* and *Mark L. Gross. Pamela S. Karlan* argued the cause for petitioners in No. 90–757. With her on the briefs were *Julius LeVonne Chambers, Charles Stephen Ralston, Dayna L. Cunningham, Ronald L. Wilson, C. Lani Guinier, William P. Quigley, Roy Rodney, Jr.*

*Robert G. Pugh* argued the cause for respondents in both cases. With him on the brief were *William J. Guste, Jr.,* Attorney General of Louisiana, *M. Truman Woodward, Jr., Moise W. Dennery,* and *A. R. Christovich,* Special Assistant Attorneys General, and *Robert G. Pugh, Jr.*†

---

†Briefs of *amici curiae* urging reversal were filed for the Lawyers' Committee for Civil Rights Under Law et al. by *Frank R. Parker, Robert B. McDuff, Brenda Wright, Robert F. Mullen, David S. Tatel, Norman Redlich, Laughlin McDonald, Neil Bradley, Kathleen L. Wilde, Mary Wyckoff, Samuel Rabinove, Richard T. Foltin, Antonia Hernandez,* and *Judith Sanders-Castro;* for Supreme Court Justice for Orleans, Inc., by *M. David Gelfand, Terry E. Allbritton, John S. Keller,* and *Ira J. Middleberg;* and for Darleen M. Jacobs by *Ms. Jacobs, pro se,* and *Brian C. Beckwith.*

Briefs of *amici curiae* urging affirmance were filed for the State of Georgia by *Michael J. Bowers,* Attorney General, *Carol Atha Cosgrove,* Assistant Attorney General, and *David F. Walbert;* for the Pacific Legal Founda-

JUSTICE STEVENS delivered the opinion of the Court.

The preamble to the Voting Rights Act of 1965 establishes that the central purpose of the Act is "[t]o enforce the fifteenth amendment to the Constitution of the United States."[1] The Fifteenth Amendment provides:

> "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U. S. Const., Amdt. 15, § 1.

In 1982, Congress amended § 2 of the Voting Rights Act[2] to make clear that certain practices and procedures that *result* in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent

---

tion by *Ronald A. Zumbrun* and *Anthony T. Caso;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar.*

*Edwin F. Hendricks* filed a brief for the American Judicature Society as *amicus curiae.*

[1] Pub. L. 89–110, 79 Stat. 437, 42 U. S. C. § 1973 *et seq.* (1964 ed., Supp. I).

[2] Section 2 of the Voting Rights Act of 1965, as amended, now reads:

"SEC. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 96 Stat. 134. Section 2 has been codified at 42 U. S. C. § 1973.

protects them from constitutional challenge. The question presented by these cases is whether this "results test" protects the right to vote in state judicial elections. We hold that the coverage provided by the 1982 amendment is coextensive with the coverage provided by the Act prior to 1982 and that judicial elections are embraced within that coverage.

I

Petitioners in No. 90–757 represent a class of approximately 135,000 black registered voters in Orleans Parish, Louisiana. App. 6–7, 13. They brought this action against the Governor and other state officials (respondents) to challenge the method of electing justices of the Louisiana Supreme Court from the New Orleans area. The United States, petitioner in No. 90–1032, intervened to support the claims advanced by the plaintiff class.

The Louisiana Supreme Court consists of seven justices,[3] five of whom are elected from five single-member Supreme Court Districts, and two of whom are elected from one multimember Supreme Court District.[4] Each of the seven members of the court must be a resident of the district from which he or she is elected and must have resided there for at least two years prior to election. App. to Pet. for Cert. 7a. Each of the justices on the Louisiana Supreme Court serves a term of 10 years.[5] The one multimember district, the First Supreme Court District, consists of the parishes of Orleans, St. Bernard, Plaquemines, and Jefferson.[6] Orleans Parish contains about half of the population of the First Supreme Court District and about half of the registered voters in that district. *Chisom* v. *Edwards*, 839 F. 2d 1056, 1057 (CA5 1988). More than one-half of the registered voters of Orleans Parish are black, whereas more than three-fourths of

---

[3] La. Const., Art. 5, § 3; La. Rev. Stat. Ann. § 13:101 (West 1983).
[4] La. Const., Art. 5, § 22(A); La. Rev. Stat. Ann. § 13:101 (West 1983).
[5] La. Const., Art. 5, § 3.
[6] La. Const., Art. 5, § 4; La. Rev. Stat. Ann. § 13:101 (West 1983).

the registered voters in the other three parishes are white. App. 8.

Petitioners allege that "the present method of electing two Justices to the Louisiana Supreme Court at-large from the New Orleans area impermissibly dilutes minority voting strength" in violation of § 2 of the Voting Rights Act. *Id.*, at 9. Furthermore, petitioners claimed in the courts below that the current electoral system within the First Supreme Court District violates the Fourteenth and Fifteenth Amendments of the Federal Constitution because the purpose and effect of this election practice "is to dilute, minimize, and cancel the voting strength" of black voters in Orleans Parish. *Ibid.* Petitioners seek a remedy that would divide the First District into two districts, one for Orleans Parish and the second for the other three parishes. If this remedy were adopted, the seven members of the Louisiana Supreme Court would each represent a separate single-member judicial district, and each of the two new districts would have approximately the same population. *Id.*, at 8. According to petitioners, the new Orleans Parish district would also have a majority black population and majority black voter registration. *Id.*, at 8, 47.

The District Court granted respondents' motion to dismiss the complaint. *Chisom* v. *Edwards*, 659 F. Supp. 183 (ED La. 1987). It held that the constitutional claims were insufficient because the complaint did not adequately allege a specific intent to discriminate. *Id.*, at 189. With respect to the statutory claim, the court held that § 2 is not violated unless there is an abridgment of minority voters' opportunity "to elect representatives of their choice." *Id.*, at 186–187. The court concluded that because judges are not "representatives," judicial elections are not covered by § 2. *Id.*, at 187.

The Court of Appeals for the Fifth Circuit reversed. *Chisom* v. *Edwards*, 839 F. 2d 1056, cert. denied *sub nom. Roemer* v. *Chisom*, 488 U. S. 955 (1988). Before beginning its analysis, the court remarked that "[i]t is particularly sig-

nificant that no black person has ever been elected to the Louisiana Supreme Court, either from the First Supreme Court District or from any one of the other five judicial districts." 839 F. 2d, at 1058. After agreeing with the recently announced opinion in *Mallory* v. *Eyrich*, 839 F. 2d 275 (CA6 1988), it noted that the broad definition of the terms "voting" and "vote" in § 14(c)(1) of the original Act expressly included judicial elections within the coverage of § 2.[7] It also recognized Congress' explicit intent to expand the coverage of § 2 by enacting the 1982 amendment. 839 F. 2d, at 1061.[8] Consistent with Congress' efforts to broaden coverage under the Act, the court rejected the State's contention that the term "representatives" in the 1982 amendment was used as a word of limitation. *Id.*, at 1063 (describing State's

---

[7] "Section 14(c)(1), which defines 'voting' and 'vote' for purposes of the Act, sets forth the types of election practices and elections which are encompassed within the regulatory sphere of the Act. Section 14(c)(1) states:

"The terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." See 42 U. S. C. § 1973*l*(c)(1).

"Clearly, judges are 'candidates for public or party office' elected in a primary, special, or general election; therefore, section 2, by its express terms, extends to state judicial elections. This truly is the only construction consistent with the plain language of the Act." 839 F. 2d, at 1059–1060.

[8] "It is difficult, if not impossible, for this Court to conceive of Congress, in an express attempt to expand the coverage of the Voting Rights Act, to have in fact amended the Act in a manner affording minorities less protection from racial discrimination than that provided by the Constitution. . . . [S]ection 2 necessarily embraces judicial elections within its scope. Any other construction of section 2 would be wholly inconsistent with the plain language of the Act and the express purpose which Congress sought to attain in amending section 2; that is, to expand the protection of the Act." *Id.*, at 1061.

position as "untenable"). Instead, the court concluded that representative "'denotes anyone selected or chosen by popular election from among a field of candidates to fill an office, including judges.'" *Ibid.* (quoting *Martin* v. *Allain,* 658 F. Supp. 1183, 1200 (SD Miss. 1987)). The court buttressed its interpretation by noting that "section 5 and section 2, virtually companion sections, operate in tandem to prohibit discriminatory practices in voting, whether those practices originate in the past, present, or future." 839 F. 2d, at 1064. It also gleaned support for its construction of § 2 from the fact that the Attorney General had "consistently supported an expansive, not restrictive, construction of the Act." *Ibid.* Finally, the court held that the constitutional allegations were sufficient to warrant a trial, and reinstated all claims. *Id.,* at 1065.[9]

After the case was remanded to the District Court, the United States filed a complaint in intervention in which it alleged that the use of a multimember district to elect two members of the Louisiana Supreme Court is a "standard, practice or procedure" that "results in a denial or abridgment of the right to vote on account of race or color in violation of Section 2 of the Voting Rights Act." App. 48. After a nonjury trial, however, the District Court concluded that the evidence did not establish a violation of § 2 under the standards set forth in *Thornburg* v. *Gingles,* 478 U. S. 30 (1986).

---

[9] After remand, but before trial, plaintiffs (here petitioners) moved for a preliminary injunction, enjoining the October 1, 1988, election for one of the two Louisiana Supreme Court seats from the First Supreme Court District. The District Court granted plaintiffs' motion, having found that they satisfied the four elements required for injunctive relief. *Chisom* v. *Edwards,* 690 F. Supp. 1524, 1531 (ED La. 1988). The Court of Appeals, however, vacated the preliminary injunction and ordered that the election proceed as scheduled. *Chisom* v. *Roemer,* 853 F. 2d 1186, 1192 (CA5 1988). It reasoned that if the election were enjoined, the resulting uncertainty would have a deleterious effect on the Louisiana Supreme Court and the administration of justice that would outweigh any potential harm plaintiffs might suffer if the election went forward. *Id.,* at 1190–1192.

App. to Pet. for Cert. 62a. The District Court also dismissed the constitutional claims. *Id.*, at 63a–64a. Petitioners and the United States appealed. While their appeal was pending, the Fifth Circuit, sitting en banc in another case, held that judicial elections were not covered under § 2 of the Act as amended. *League of United Latin American Citizens Council No. 4434* v. *Clements*, 914 F. 2d 620 (1990) (hereinafter *LULAC*).

The majority in *LULAC* concluded that Congress' use of the word "representatives" in the phrase "to elect representatives of their choice" in § 2(b) of the Act indicated that Congress did not intend to authorize vote dilution claims in judicial elections. The en banc panel reached this conclusion after considering (1) the "precise language" of the amendment, *id.*, at 624; (2) the character of the judicial office, with special emphasis on "the cardinal reason that judges need not be elected at all," *id.*, at 622; and (3) the fact that the one-person, one-vote rule had been held inapplicable to judicial elections before 1982, *id.*, at 626.

The precise language of § 2 on which the *LULAC* majority focused provides that a violation of § 2 is established if the members of a protected class

> "'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.*, at 625 (quoting 42 U. S. C. § 1973(b)).

Noting that this language protects both the "the broad and general opportunity to participate in the political process and the specific one to elect representatives," *LULAC*, 914 F. 2d, at 625, the court drew a distinction between claims involving tests or other devices that interfere with individual participation in an election, on the one hand, and claims of vote dilution that challenge impairment of a group's opportunity to elect representatives of their choice, on the other hand. The majority assumed that the amended § 2 would continue to apply to judicial elections with respect to claims in the first

category, see *ibid.*, but that the word "representatives" excludes judicial elections from claims in the second category, see *id.*, at 625–628.

In the majority's view, it was "factually false" to characterize judges as representatives because public opinion is "irrelevant to the judge's role," *id.*, at 622; "the judiciary serves no representative function whatever: the judge represents no one," *id.*, at 625. The majority concluded that judicial offices "are not 'representative' ones, and their occupants are not representatives." *Id.*, at 631. Thus, Congress would not have used the word "representatives," as it did in § 2(b) of the Act, if it intended that subsection to apply to vote dilution claims in judicial elections.

The majority also assumed that Congress was familiar with *Wells* v. *Edwards*, 347 F. Supp. 453 (MD La. 1972), summarily aff'd, 409 U. S. 1095 (1973), a reapportionment case in which the District Court held that "the concept of one-man, one-vote apportionment does not apply to the judicial branch of the government." 347 F. Supp., at 454. The express reference in the Senate Report to the fact that the "'principle that the right to vote is denied or abridged by dilution of voting strength derives from the one-person, one-vote reapportionment case of *Reynolds* v. *Sims*, [377 U. S. 533 (1964)],'" *LULAC*, 914 F. 2d, at 629 (quoting S. Rep. No. 97–417, p. 19 (1982)), persuaded the majority that, in light of the case law holding that judges were not representatives in the context of one-person, one-vote reapportionment cases, see *LULAC*, 914 F. 2d, at 626 (citing cases), Congress would not have authorized vote dilution claims in judicial elections without making an express, unambiguous statement to that effect.

Following the en banc decision in *LULAC*, the Court of Appeals remanded this litigation to the District Court with directions to dismiss the complaint. 917 F. 2d 187 (1990) *(per curiam)*. It expressed no opinion on the strength of petitioners' evidentiary case. We granted certiorari, 498

U. S. 1060 (1991), and set the case for argument with *LULAC*, see *post*, p. 419.

## II

Our decision today is limited in character, and thus, it is useful to begin by identifying certain matters that are not in dispute. No constitutional claims are before us.[10] Unlike *Wells* v. *Edwards*,[11] *White* v. *Regester*,[12] and *Mobile* v. *Bolden*,[13] this case presents us solely with a question of statutory construction. That question involves only the scope of the coverage of § 2 of the Voting Rights Act as amended in 1982. We therefore do not address any question concerning the elements that must be proved to establish a violation of the Act or the remedy that might be appropriate to redress a violation if proved.

It is also undisputed that § 2 applied to judicial elections prior to the 1982 amendment,[14] and that § 5 of the amended statute continues to apply to judicial elections, see *Clark* v. *Roemer*, 500 U. S. 646 (1991). Moreover, there is no question that the terms "standard, practice, or procedure" are broad enough to encompass the use of multimember districts to minimize a racial minority's ability to influence the outcome of an election covered by § 2.[15] The only matter in dis-

---

[10] Petitioners did not seek review in this Court of the disposition of their constitutional claims. Brief for Petitioners in No. 90–757, p. 8, n. 2; Brief for United States 4, n. 2; Tr. of Oral Arg. 27.

[11] 409 U. S. 1095 (1973), aff'g 347 F. Supp. 453 (MD La. 1972) (whether election of State Supreme Court justices by district violated the Equal Protection Clause of the Fourteenth Amendment).

[12] 412 U. S. 755 (1973) (whether population differential among districts established a prima facie case of invidious discrimination under the Equal Protection Clause of the Fourteenth Amendment).

[13] 446 U. S. 55 (1980) (whether at-large system of municipal elections violated black voters' rights under the Fourteenth and Fifteenth Amendments).

[14] See Brief for Respondents 16; Tr. of Oral Arg. 42.

[15] In *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), the Court held that a local Act redefining the boundaries of the city of Tuskegee, Alabama, vio-

pute is whether the test for determining the legality of such a practice, which was added to the statute in 1982, applies in judicial elections as well as in other elections.

### III

The text of §2 of the Voting Rights Act as originally enacted read as follows:

> "SEC. 2. No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."  79 Stat. 437.

The terms "vote" and "voting" were defined elsewhere in the Act to include "all action necessary to make a vote effective *in any primary, special, or general election.*"  § 14(c)(1) of the Act, 79 Stat. 445 (emphasis added).  The statute further defined vote and voting as "votes cast with respect to candidates for public or party office and propositions for which votes are received in an election."  *Ibid.*

---

lated the Fifteenth Amendment.  In his opinion for the Court, Justice Frankfurter wrote:

"The opposite conclusion, urged upon us by respondents, would sanction the achievement by a State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions."  *Id.*, at 345.

"A statute which is alleged to have worked unconstitutional deprivations of petitioners' rights is not immune to attack simply because the mechanism employed by the legislature is a redefinition of municipal boundaries.  According to the allegations here made, the Alabama Legislature has not merely redrawn the Tuskegee city limits with incidental inconvenience to the petitioners; it is more accurate to say that it has deprived the petitioners of the municipal franchise and consequent rights and to that end it has incidentally changed the city's boundaries.  While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights."  *Id.*, at 347.

At the time of the passage of the Voting Rights Act of 1965, § 2, unlike other provisions of the Act, did not provoke significant debate in Congress because it was viewed largely as a restatement of the Fifteenth Amendment. See H. R. Rep. No. 439, 89th Cong., 1st Sess., 23 (1965) (§ 2 "grants . . . a right to be free from enactment or enforcement of voting qualifications . . . or practices which deny or abridge the right to vote on account of race or color"); see also S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 19–20 (1965). This Court took a similar view of § 2 in *Mobile* v. *Bolden,* 446 U. S. 55, 60–61 (1980). There, we recognized that the coverage provided by § 2 was unquestionably coextensive with the coverage provided by the Fifteenth Amendment; the provision simply elaborated upon the Fifteenth Amendment. *Ibid.* Section 2 protected the right to vote, and it did so without making any distinctions or imposing any limitations as to which elections would fall within its purview. As Attorney General Katzenbach made clear during his testimony before the House, "[e]very election in which registered electors are permitted to vote would be covered" under § 2.[16]

The 1965 Act made it unlawful "to deny or abridge" the right to vote "on account of race or color." 79 Stat. 437. Congress amended § 2 in 1975[17] by expanding the original prohibition against discrimination "on account of race or color" to include non-English-speaking groups. It did this by replacing "race or color" with "race or color, or in contravention of the guarantees set forth in section 4(f)(2)" of the Act. 89 Stat. 402.[18] The 1982 amendment further expanded the protection afforded by § 2.

---

[16] Hearings on H. R. 6400 and Other Proposals To Enforce the 15th Amendment to the Constitution of the United States before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 21 (1965).

[17] Pub. L. 94–73, 89 Stat. 400.

[18] The 1975 amendment added a new subsection to § 4 of the Act. The new subsection reads in part as follows:

Justice Stewart's opinion for the plurality in *Mobile* v. *Bolden, supra,* which held that there was no violation of either the Fifteenth Amendment or § 2 of the Voting Rights Act absent proof of intentional discrimination, served as the impetus for the 1982 amendment.  One year after the decision in *Mobile,* Chairman Rodino of the House Judiciary Committee introduced a bill to extend the Voting Rights Act and its bilingual requirements, and to amend § 2 by striking out "to deny or abridge" and substituting "in a manner which *results* in a denial or abridgment of." [19]  The "results" test proposed by Chairman Rodino was incorporated into S. 1992,[20] and ultimately into the 1982 amendment to § 2, and is now the focal point of this litigation.

---

"(f)(1) The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope.  Such minority citizens are from environments in which the dominant language is other than English. . . .

"(2) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group."  89 Stat. 401. See 42 U. S. C. §§ 1973b(f)(1), (2).

[19] H. R. 3112, 97th Cong., 1st Sess. (1981) (emphasis added).

[20] "The objectives of S. 1992, as amended, are as follows: (1) to extend the present coverage of the special provisions of the Voting Rights Act, Sections 4, 5, 6, 7 and 8; (2) to amend Section 4(a) of the Act to permit individual jurisdictions to meet a new, broadened standard for termination of coverage by those special provisions; (3) to amend the language of Section 2 in order to clearly establish the standards intended by Congress for proving a violation of that section; (4) to extend the language-assistance provisions of the Act until 1992; and (5) to add a new section pertaining to voting assistance for voters who are blind, disabled, or illiterate.

.        .        .        .        .

"S. 1992 amends Section 2 of the Voting Rights Act of 1965 to prohibit any voting practice, or procedure [that] results in discrimination.  This amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2.  It thereby restores the legal standards, based on the controlling Supreme Court precedents, which applied in voting discrimination claims prior to the litigation involved in

Under the amended statute, proof of intent is no longer required to prove a §2 violation. Now plaintiffs can prevail under §2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race. Congress not only incorporated the results test in the paragraph that formerly constituted the entire §2, but also designated that paragraph as subsection (a) and added a new subsection (b) to make clear that an application of the results test requires an inquiry into "the totality of the circumstances."[21] The full text of §2 as amended in 1982 reads as follows:

"SEC. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on

*Mobile* v. *Bolden*. The amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test by codifying the leading pre-*Bolden* vote dilution case, *White* v. *Regester*.

"This new subsection provides that the issue to be decided under the results test is whether the political processes are equally open to minority voters. The new subsection also states that the section does not establish a right to proportional representation." S. Rep. No. 97–417, p. 2 (1982) (footnotes omitted).

[21] "The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the juridiction in question, results in minorities being denied equal access to the political process.

"The 'results' standard is meant to restore the pre-*Mobile* legal standard which governed cases challenging election systems or practices as an illegal dilution of the minority vote." *Id.*, at 27 (footnote omitted).

See also *Thornburg* v. *Gingles*, 478 U. S. 30, 83–84 (1986) (O'CONNOR, J., concurring in judgment) ("Amended §2 is intended to codify the 'results' test employed in *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971), and *White* v. *Regester*, 412 U. S. 755 (1973), and to reject the 'intent' test propounded in the plurality opinion in *Mobile* v. *Bolden*, 446 U. S. 55 (1980))."

account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

"(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."  96 Stat. 134.

The two purposes of the amendment are apparent from its text.` Subsection (a) adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish *any* violation of the section.  Subsection (b) provides guidance about how the results test is to be applied.

Respondents contend, and the *LULAC* majority agreed, that Congress' choice of the word "representatives" in the phrase "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice"[22] in subsection (b) is evi-

---

[22] The phrase is borrowed from JUSTICE WHITE's opinion for the Court in *White* v. *Regester*, 412 U. S. 755 (1973), which predates *Mobile* v. *Bolden*, 446 U. S. 55 (1980).  Congress explained that its purpose in adding subsection 2(b) was to "embod[y] the test laid down by the Supreme Court in *White*." S. Rep. No. 97–417, at 27.  In *White*, the Court said that the "plaintiffs' burden is to produce evidence . . . that [the minority group's] members had less opportunity than did other residents in the district to

dence of congressional intent to exclude vote dilution claims involving judicial elections from the coverage of § 2. We reject that construction because we are convinced that if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment.[23] Our conclusion is confirmed when we review the justifications offered by the *LULAC* majority and respondents in support of their construction of the statute; we address each of their main contentions in turn.

## IV

The *LULAC* majority assumed that § 2 provides two distinct types of protection for minority voters—it protects their opportunity "to participate in the political process" and their opportunity "to elect representatives of their choice." See *LULAC*, 914 F. 2d, at 625. Although the majority interpreted "representatives" as a word of limitation, it assumed that the word eliminated judicial elections only from the latter protection, without affecting the former. *Id.*, at 625, 629. In other words, a standard, practice, or procedure in a judicial election, such as a limit on the times that polls are open, which has a disparate impact on black voters' opportunity to cast their ballots under § 2, may be challenged even if a different practice that merely affects their opportunity to elect representatives of their choice to a judicial office may

---

participate in the political processes and to elect legislators of their choice." 412 U. S., at 766.

[23] Congress' silence in this regard can be likened to the dog that did not bark. See A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927). Cf. *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 602 (1980) (REHNQUIST, J., dissenting) ("In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night"). See also *American Hospital Assn.* v. *NLRB*, 499 U. S. 606 (1991).

not. This reading of § 2, however, is foreclosed by the statutory text and by our prior cases.

Any abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election. As the statute is written, however, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights. Subsection (a) covers every application of a qualification, standard, practice, or procedure that results in a denial or abridgment of *"the right"* to vote. The singular form is also used in subsection (b) when referring to an injury to members of the protected class who have less "opportunity" than others "to participate in the political process *and* to elect representatives of their choice." 42 U. S. C. § 1973 (emphasis added). It would distort the plain meaning of the sentence to substitute the word "or" for the word "and." Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect.[24]

The statutory language is patterned after the language used by JUSTICE WHITE in his opinions for the Court in *White* v. *Regester*, 412 U. S. 755 (1973), and *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971). See n. 22, *supra*. In both opinions, the Court identified the opportunity to participate and the opportunity to elect as inextricably linked. In *White* v. *Regester*, the Court described the connection as follows: "The plaintiffs' burden is to produce evidence . . . that its mem-

---

[24] JUSTICE SCALIA argues that our literal reading of the word "and" leads to the conclusion that a small minority has no protection against infringements of its right " 'to participate in the political process' " because it will always lack the numbers necessary "to elect its candidate," *post*, at 409. This argument, however, rests on the erroneous assumption that a small group of voters can never influence the outcome of an election.

bers had less opportunity than did other residents in the district to participate in the political processes *and* to elect legislators of their choice." 412 U. S., at 766 (emphasis added). And earlier, in *Whitcomb* v. *Chavis,* the Court described the plaintiffs' burden as entailing a showing that they "had less opportunity than did other . . . residents to participate in the political processes *and* to elect legislators of their choice." 403 U. S., at 149 (emphasis added).[25]

The results test mandated by the 1982 amendment is applicable to all claims arising under § 2. If the word "representatives" did place a limit on the coverage of the Act for judicial elections, it would exclude all claims involving such elections from the protection of § 2. For all such claims must allege an abridgment of the opportunity to participate in the political process *and* to elect representatives of one's choice. Even if the wisdom of Solomon would support the *LULAC* majority's proposal to preserve claims based on an interference with the right to vote in judicial elections while eschewing claims based on the opportunity to elect judges, we have no authority to divide a unitary claim created by Congress.

## V

Both respondents and the *LULAC* majority place their principal reliance on Congress' use of the word "representatives" instead of "legislators" in the phrase "to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973. When Congress borrowed the phrase from *White* v. *Regester,* it replaced "legislators" with "representatives."[26] This substitution indicates, at the very

---

[25] See also *Reynolds* v. *Sims,* 377 U. S. 533, 565 (1964) ("Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature").

[26] The word "representatives" rather than "legislators" was included in Senator Robert Dole's compromise, which was designed to assuage the fears of those Senators who viewed the House's version, H. R. 3112, as an invitation for proportional representation and electoral quotas. Senator

least, that Congress intended the amendment to cover more than legislative elections. Respondents argue, and the majority agreed, that the term "representatives" was used to extend § 2 coverage to executive officials, but not to judges. We think, however, that the better reading of the word "representatives" describes the winners of representative, popular elections. If executive officers, such as prosecutors, sheriffs, state attorneys general, and state treasurers, can be considered "representatives" simply because they are chosen by popular election, then the same reasoning should apply to elected judges.[27]

Respondents suggest that if Congress had intended to have the statute's prohibition against vote dilution apply to the election of judges, it would have used the word "candidates" instead of "representatives." Brief for Respondents 20, and n. 9. But that confuses the ordinary meaning of the words.

Dole explained that the compromise was intended both to embody the belief "that a voting practice or procedure which is discriminatory in result should not be allowed to stand, regardless of whether there exists a discriminatory purpose or intent" and to "delineat[e] what legal standard should apply under the results test and clarif[y] that it is not a mandate for proportional representation." Hearings on S. 53 et al. before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 2d Sess., 60 (1982). Thus, the compromise was not intended to exclude any elections from the coverage of subsection (a), but simply to make clear that the results test does not require the proportional election of minority candidates in *any* election.

[27] Moreover, this Court has recently recognized that judges do engage in policymaking at some level. See *Gregory* v. *Ashcroft, post*, at 466–467 ("It may be sufficient that the appointee is in a position requiring the exercise of discretion concerning issues of public importance. This certainly describes the bench, regardless of whether judges might be considered policymakers in the same sense as the executive or legislature"). A judge brings to his or her job of interpreting texts "a well-considered judgment of what is best for the community." *Post*, at 466. As the concurrence notes, Justice Holmes and Justice Cardozo each wrote eloquently about the "policymaking nature of the judicial function." *Post*, at 482 (WHITE, J., concurring in part, dissenting in part, and concurring in judgment).

The word "representative" refers to someone who has prevailed in a popular election, whereas the word "candidate" refers to someone who is seeking an office. Thus, a candidate is nominated, not elected. When Congress used "candidate" in other parts of the statute, it did so precisely because it was referring to people who were aspirants for an office. See, e. g., 42 U. S. C. §§ 1971(b) ("any candidate for the office of President"), 1971(e) ("candidates for public office"), 1973i(c) ("any candidate for the office of President"), 1973i(e)(2) ("any candidate for the office of President"), 1973l(c) ("candidates for public or party office"), 1973ff–2 ("In the case of the offices of President and Vice President, a vote for a named candidate"), 1974 ("candidates for the office of President"), 1974e ("candidates for the office of President").

The *LULAC* majority was, of course, entirely correct in observing that "judges need not be elected at all," 914 F. 2d, at 622, and that ideally public opinion should be irrelevant to the judge's role because the judge is often called upon to disregard, or even to defy, popular sentiment. The Framers of the Constitution had a similar understanding of the judicial role, and as a consequence, they established that Article III judges would be appointed, rather than elected, and would be sheltered from public opinion by receiving life tenure and salary protection. Indeed, these views were generally shared by the States during the early years of the Republic.[28] Louisiana, however, has chosen a different course. It has decided to elect its judges and to compel judicial candidates to vie for popular support just as other political candidates do.

The fundamental tension between the ideal character of the judicial office and the real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for

---

[28] See generally Winters, Selection of Judges—An Historical Introduction, 44 Texas L. Rev. 1081, 1082–1083 (1966).

elected office.[29]    When each of several members of a court must be a resident of a separate district, and must be elected by the voters of that district, it seems both reasonable and realistic to characterize the winners as representatives of that district.    Indeed, at one time the Louisiana Bar Association characterized the members of the Louisiana Supreme Court as representatives for that reason: "Each justice and judge now in office shall be considered as a representative of the judicial district within which is situated the parish of his residence at the time of his election."[30]    Louisiana could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed, and, in that way, it could enable its judges to be indifferent to popular opinion.    The reasons why Louisiana has chosen otherwise are precisely the reasons why it is appropriate for § 2, as well as § 5, of the Voting Rights Act to continue to apply to its judicial elections.

The close connection between §§ 2 and 5 further undermines respondents' view that judicial elections should not be covered under § 2.    Section 5 requires certain States to submit changes in their voting procedures to the District Court of the District of Columbia or to the Attorney General for preclearance.    Section 5 uses language similar to that of § 2

---

[29] "Financing a campaign, soliciting votes, and attempting to establish charisma or name identification are, at the very least, unseemly for judicial candidates" because "it is the business of judges to be indifferent to popularity."    Stevens, The Office of an Office, Chicago Bar Rec. 276, 280, 281 (1974).

[30] Louisiana State Law Institute, Project of a Constitution for the State of Louisiana with Notes and Studies 1039 (1954) (1921 Report of the Louisiana Bar Association submitted to the Louisiana Constitutional Convention).    The editors of the project explained that they included the 1921 Report because "on the major issues involved in revising the judicial provisions of the present constitution, it offers many proposals, that even after the passage of thirty years, still merit serious consideration.    Of particular interest are the procedures for the selection, retirement and removal of judges. . . ."    *Id.*, at 1035.

in defining prohibited practices: "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U. S. C. § 1973c. This Court has already held that § 5 applies to judicial elections. *Clark* v. *Roemer,* 500 U. S. 646 (1991). If § 2 did not apply to judicial elections, a State covered by § 5 would be precluded from implementing a new voting procedure having discriminatory effects with respect to judicial elections, whereas a similarly discriminatory system already in place could not be challenged under § 2. It is unlikely that Congress intended such an anomalous result.

## VI

Finally, both respondents and the *LULAC* majority suggest that no judicially manageable standards for deciding vote dilution claims can be fashioned unless the standard is based on the one-person, one-vote principle.[31] They reason that because we have held the one-person, one-vote rule inapplicable to judicial elections, see *Wells* v. *Edwards,* 409 U. S. 1095 (1973), aff'g 347 F. Supp., at 454, it follows that judicial elections are entirely immune from vote dilution

---

[31] The "one-person, one-vote" principle was first set forth in *Gray* v. *Sanders,* 372 U. S. 368, 379, 381 (1963):

". . . Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment.

". . . The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."

Since then, the rule has been interpreted to mean that "each person's vote counts as much, insofar as it is practicable, as any other person's." *Hadley* v. *Junior College District of Metropolitan Kansas City,* 397 U. S. 50, 54 (1970).

claims. The conclusion, however, does not follow from the premise.

The holding in *Wells* rejected a constitutional challenge based on the Equal Protection Clause of the Fourteenth Amendment. It has no more relevance to a correct interpretation of this statute than does our decision in *Mobile* v. *Bolden*, 446 U. S. 55 (1980), which also rejected a constitutional claim. The statute was enacted to protect voting rights that are not adequately protected by the Constitution itself. Cf. *City of Rome* v. *United States*, 446 U. S. 156, 172–183 (1980). The standard that should be applied in litigation under § 2 is not at issue here.[32] Even if serious problems lie ahead in applying the "totality of circumstances" standard described in § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress.

## VII

Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of "rid[ding] the country of racial discrimination in voting." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 315 (1966). In *Allen* v. *State Board of Elections*, 393 U. S. 544, 567 (1969), we said that the Act should be interpreted in a manner that provides "the broadest possible scope" in combating racial discrimination. Congress amended the Act in 1982 in order to relieve plaintiffs of the burden of proving discriminatory intent, after a plurality of this Court had concluded that the original Act, like the

[32] We note, however, that an analysis of a proper statutory standard under § 2 need not rely on the one-person, one-vote constitutional rule. See *Thornburg* v. *Gingles*, 478 U. S., at 88–89 (O'CONNOR, J., concurring in judgment); see also *White* v. *Regester*, 412 U. S. 755 (1973) (holding that multimember districts were invalid, notwithstanding compliance with one-person, one-vote rule). Moreover, *Clark* v. *Roemer*, 500 U. S. 646 (1991), the case in which we held that § 5 applies to judicial elections, was a vote dilution case. The reasoning in JUSTICE SCALIA's dissent, see *post*, at 413–416, if valid. would have led to a different result in that case.

Fifteenth Amendment, contained such a requirement. See *Mobile* v. *Bolden*, 446 U. S. 55 (1980). Thus, Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone. It is difficult to believe that Congress, in an express effort to broaden the protection afforded by the Voting Rights Act, withdrew, without comment, an important category of elections from that protection. Today we reject such an anomalous view and hold that state judicial elections are included within the ambit of § 2 as amended.

The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

Section 2 of the Voting Rights Act of 1965 is not some all-purpose weapon for well-intentioned judges to wield as they please in the battle against discrimination. It is a statute. I thought we had adopted a regular method for interpreting the meaning of language in a statute: first, find the ordinary meaning of the language in its textual context; and second, using established canons of construction, ask whether there is any clear indication that some permissible meaning other than the ordinary one applies. If not—and especially if a good reason for the ordinary meaning appears plain—we apply that ordinary meaning. See, *e. g.*, *West Virginia University Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 98–99 (1991); *Demarest* v. *Manspeaker*, 498 U. S. 184, 190 (1991); *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989); *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U. S. 552, 557–558 (1990); *Caminetti* v. *United States*, 242 U. S. 470, 485 (1917); *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 470 (1989) (KENNEDY, J., concurring in judgment).

Today, however, the Court adopts a method quite out of accord with that usual practice. It begins not with what the statute says, but with an expectation about what the statute must mean absent particular phenomena *("[W]e are convinced* that if Congress had . . . an intent [to exclude judges] Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history," *ante,* at 396 (emphasis added)); and the Court then interprets the words of the statute to fulfill its expectation. Finding nothing in the legislative history affirming that judges were excluded from the coverage of §2, the Court gives the phrase "to elect representatives" the quite extraordinary meaning that covers the election of judges.

As method, this is just backwards, and however much we may be attracted by the result it produces in a particular case, we should in every case resist it. Our job begins with a text that Congress has passed and the President has signed. We are to read the words of that text as any ordinary Member of Congress would have read them, see Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev. 417 (1899), and apply the meaning so determined. In my view, that reading reveals that §2 extends to vote dilution claims for the elections of representatives only, and judges are not representatives.

I

As the Court suggests, the 1982 amendments to the Voting Rights Act were adopted in response to our decision in *Mobile* v. *Bolden,* 446 U. S. 55 (1980), which had held that the scope of the original Voting Rights Act was coextensive with the Fifteenth Amendment, and thus proscribed intentional discrimination only. I agree with the Court that that original legislation, directed toward intentional discrimination, applied to all elections, for it clearly said so:

"No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or ap-

plied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 79 Stat. 437.

The 1982 amendments, however, radically transformed the Act. As currently written, the statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional. This new "results" criterion provides a powerful, albeit sometimes blunt, weapon with which to attack even the most subtle forms of discrimination. The question we confront here is how broadly the new remedy applies. The foundation of the Court's analysis, the itinerary for its journey in the wrong direction, is the following statement: "It is difficult to believe that Congress, in an express effort to broaden the protection afforded by the Voting Rights Act, withdrew, without comment, an important category of elections from that protection." *Ante*, at 404. There are two things wrong with this. First is the notion that Congress cannot be credited with having achieved anything of major importance by simply saying it, in ordinary language, in the text of a statute, "without comment" in the legislative history. As the Court colorfully puts it, if the dog of legislative history has not barked nothing of great significance can have transpired. *Ante*, at 396, n. 23. Apart from the questionable wisdom of assuming that dogs will bark when something important is happening, see 1 T. Livius, The History of Rome 411–413 (1892) (D. Spillan transl.), we have forcefully and explicitly rejected the Conan Doyle approach to statutory construction in the past. See *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 592 (1980) ("In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark"). We are here to apply the statute, not legislative history, and certainly not the absence of legislative history. Statutes are the law though sleeping dogs lie. See, *e. g.*, *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 495–496, n. 13

(1985); *Williams* v. *United States,* 458 U. S. 279, 294–295 (1982) (MARSHALL, J., dissenting).

The more important error in the Court's starting point, however, is the assumption that the effect of excluding judges from the revised § 2 would be to "withdr[aw] . . . an important category of elections from [the] protection [of the Voting Rights Act]." *Ante,* at 404. There is absolutely no question here of *withdrawing* protection. Since the pre-1982 content of § 2 was coextensive with the Fifteenth Amendment, the entirety of that protection subsisted in the Constitution, and could be enforced through the other provisions of the Voting Rights Act. Nothing was lost from the prior coverage; *all* of the new "results" protection was an add-on. The issue is not, therefore, as the Court would have it, *ante,* at 395–396, whether Congress has cut back on the coverage of the Voting Rights Act; the issue is how far it has extended it. Thus, even if a court's expectations were a proper basis for interpreting the text of a statute, while there would be reason to expect that Congress was not "withdrawing" protection, there is no particular reason to expect that the supplemental protection it provided was any more extensive than the text of the statute said.

What it said, with respect to establishing a violation of the amended § 2, is the following:

". . . A violation . . . is established if . . . it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate *to participate in the political process* and *to elect representatives of their choice.*" 42 U. S. C. § 1973(b) (emphasis added).

Though this text nowhere speaks of "vote dilution," *Thornburg* v. *Gingles,* 478 U. S. 30 (1986), understood it to proscribe practices which produce that result, identifying as the statutory basis for a dilution claim the second of the two

phrases highlighted above—"to elect representatives of their choice."[1]  Under this interpretation, the other highlighted phrase—"to participate in the political process"—is left for other, *nondilution* § 2 violations.  If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity *"to partici-pate* in the political process" than whites, and § 2 would therefore be violated—even if the number of potential black voters was so small that they would on no hypothesis be able *to elect* their own candidate, see Blumstein, Proving Race Discrimination, 69 Va. L. Rev. 633, 706–707 (1983).

The Court, however, now rejects *Thornburg's* reading of the statute, and asserts that before a violation of § 2 can be made out, *both* conditions of § 2(b) must be met.  As the Court explains,

> "As the statute is written, . . . the inability to elect representatives of their choice is not sufficient to establish a

---

[1] As the *Thornburg* Court noted, the plaintiffs' allegation was "that the redistricting scheme impaired black citizens' ability to elect representatives of their choice in violation of . . . § 2 of the Voting Rights Act," 478 U. S., at 35.  See also *id.,* at 46, n. 12 ("The claim we address in this opinion is . . . that their ability *to elect* the representatives of their choice was impaired by the selection of a multimember electoral structure").  And as we explained the requirement for recovery in the case:

"Minority voters who contend that the multimember form of districting violates § 2 must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability *to elect* their preferred candidates." *Id.,* at 48 (emphasis added).

While disagreeing with the Court's formulation of a remedy, JUSTICE O'CONNOR acknowledged that this structure underlay the Court's analysis, pointing out that in the Court's view

"minority voting strength is to be assessed *solely* in terms of the minority group's ability *to elect* candidates it prefers. . . . Under this approach, the essence of a vote dilution claim is that the State has created single-member or multimember districts that unacceptably impair the minority group's ability *to elect* the candidates its members prefer." *Id.,* at 88 (opinion concurring in judgment) (emphasis added and deleted).

violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute does not create two separate and distinct rights. . . . It would distort the plain meaning of the sentence to substitute the word 'or' for the word 'and.' Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect." *Ante*, at 397.

This is unquestionably wrong. If both conditions must be violated before there is any § 2 violation, then minorities who form such a small part of the electorate in a particular jurisdiction that they could on no conceivable basis "elect representatives of their choice" would be entirely without § 2 protection. Since, as the Court's analysis suggests, the "results" test of § 2 judges a violation of the "to elect" provision on the basis of whether the practice in question prevents actual election, then a protected class that with or without the practice will be unable to elect its candidate can be denied equal opportunity "to participate in the political process" with impunity. The Court feels compelled to reach this implausible conclusion of a "singular right" because the "to participate" clause and the "to elect" clause are joined by the conjunction "and." It is unclear to me why the rules of English usage require that conclusion here, any more than they do in the case of the First Amendment—which reads "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." This has not generally been thought to protect the right peaceably to assemble only when the purpose of the assembly is to petition the Government for a redress of grievances. So also here, one is deprived of an equal "opportunity . . . to participate . . . and to elect" if *either* the opportunity to participate *or* the opportunity to elect is unequal. The point is in any event not central to the present case—and it is sad to see the Court repudiate

*Thornburg*, create such mischief in the application of § 2, and even cast doubt upon the First Amendment, merely to deprive the State of the argument that elections for judges *remain* covered by § 2 *even though* they are not subject to vote dilution claims.[2]

The Court, petitioners, and petitioners' *amici* have labored mightily to establish that there is *a* meaning of "representatives" that would include judges, see, *e. g.*, Brief for Lawyers Committee for Civil Rights as *Amicus Curiae* 10–11, and no doubt there is. But our job is not to scavenge the world of English usage to discover whether there is any possible meaning of "representatives" which suits our preconception that the statute includes judges; our job is to determine whether the *ordinary* meaning includes them, and if it does not, to ask whether there is any solid indication in the text or structure of the statute that something other than ordinary meaning was intended.

There is little doubt that the ordinary meaning of "representatives" does not include judges, see Webster's Second New International Dictionary 2114 (1950). The Court's feeble argument to the contrary is that "representatives" means those who "are chosen by popular election." *Ante*, at 399. On that hypothesis, the fan-elected members of the baseball all-star teams are "representatives"—hardly a common, if even a permissible, usage. Surely the word "representative" connotes one who is not only *elected by* the people, but who also, at a minimum, *acts on behalf of* the people. Judges do that in a sense—but not in the ordinary sense. As the captions of the pleadings in some States still display, it is

---

[2] The Court denies that this conclusion follows, because, as it claims, it "rests on the erroneous assumption that a small group of voters can never influence the outcome of an election." *Ante*, at 397, n. 24. I make no such assumption. I only assume that by "to elect" the statute does not mean "to influence," just as I assume that by "representatives" the statute does not mean "judges." We do not reject Conan Doyle's method of statutory interpretation only to embrace Lewis Carroll's.

the prosecutor who represents "the People"; the judge represents the Law—which often requires him to rule against the People. It is precisely because we do not *ordinarily* conceive of judges as representatives that we held judges not within the Fourteenth Amendment's requirement of "one person, one vote." *Wells* v. *Edwards*, 347 F. Supp. 453 (MD La. 1972), aff'd, 409 U. S. 1095 (1973). The point is not that a State could not make judges in some senses representative, or that all judges must be conceived of in the Article III mold, but rather, that giving "representatives" its ordinary meaning, the ordinary speaker in 1982 would not have applied the word to judges, see Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev. 417 (1899). It remains only to ask whether there is good indication that ordinary meaning does not apply.

There is one canon of construction that might be applicable to the present cases which, in some circumstances, would counter ordinary meaning—but here it would only have the effect of *reinforcing* it. We apply that canon to another case today, concerning, curiously enough, the very same issue of whether state judges are covered by the provisions of a federal statute. In *Gregory* v. *Ashcroft*, *post*, p. 452, we say that unless it is *clear* that the term "appointee[s] on the policymaking level" does not include judges we will construe it to include them, since the contrary construction would cause the statute to intrude upon the structure of state government, establishing a federal qualification for state judicial office. Such intrusion, we say, requires a "plain statement" before we will acknowledge it. See also *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 65 (1989); *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985); *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 99 (1984). If the same principle were applied here, we would have double reason to give "representatives" its ordinary meaning. It is true, however, that in *Gregory* interpreting the statute to include judges would make them the only high-level state

officials affected, whereas here the question is whether judges were excluded from a general imposition upon state elections that unquestionably exists; and in *Gregory* it is questionable whether Congress was invoking its powers under the Fourteenth Amendment (rather than merely the Commerce Clause), whereas here it is obvious. Perhaps those factors suffice to distinguish the two cases. Moreover, we tacitly rejected a "plain statement" rule as applied to the unamended § 2 in *City of Rome* v. *United States*, 446 U. S. 156, 178–180 (1980), though arguably that was before the rule had developed the significance it currently has. I am content to dispense with the "plain statement" rule in the present cases, cf. *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 41–42 (1989) (opinion of SCALIA, J.)—but it says something about the Court's approach to this decision that the possibility of applying that rule never crossed its mind.

While the "plain statement" rule may not be applicable, there is assuredly nothing whatever that points in the opposite direction, indicating that the ordinary meaning here should *not* be applied. Far from that, in my view the ordinary meaning of "representatives" gives clear purpose to congressional action that otherwise would seem pointless. As an initial matter, it is evident that Congress paid particular attention to the scope of elections covered by the "to elect" language. As the Court suggests, that language for the most part tracked this Court's opinions in *White* v. *Regester*, 412 U. S. 755, 766 (1973), and *Whitcomb* v. *Chavis*, 403 U. S. 124, 149 (1971), but the word "legislators" was not copied. Significantly, it was replaced not with the more general term "candidates" used repeatedly elsewhere in the Act, see, *e. g.*, 42 U. S. C. §§ 1971(b), (e); 1973i(c); 1973*l*(c)(1); 1973ff–2; 1974; 1974e, but with the term "representatives," which appears nowhere else in the Act (except as a proper noun referring to Members of the federal lower House, or designees of the Attorney General). The normal meaning of this term is broader than "legislators" (it includes, for example, school

boards and city councils as well as senators and represent-
atives) but narrower than "candidates."

The Court says that the seemingly significant refusal to
use the term "candidate" and selection of the distinctive term
"representative" are really inconsequential, because "candi-
date" could not have been used.    According to the Court,
since "candidate" refers to one who has been nominated but
*not yet* elected, the phrase "to elect candidates" would be a
contradiction in terms.   *Ante*, at 399–400.   The only flaw in
this argument is that it is not true, as repeated usage of
the formulation "to elect candidates" by this Court itself
amply demonstrates.   See, *e. g.*, *Davis* v. *Bandemer*, 478
U. S. 109, 131 (1986); *Rogers* v. *Lodge*, 458 U. S. 613,
624 (1982); *id.*, at 639, n. 18, 641, n. 22, 649 (STEVENS, J.,
dissenting); *Mobile* v. *Bolden*, 446 U. S., at 75; *United Jew-
ish Organizations of Williamsburgh, Inc.* v. *Carey*, 430
U. S. 144, 158 (1977); *Moore* v. *Ogilvie*, 394 U. S. 814, 819
(1969); *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 569
(1969).   We even used the phrase repeatedly in *Thornburg*.
*Thornburg* v. *Gingles*, 478 U. S., at 40, 44, 50, 54, 80; *id.*,
at 86, 103 (O'CONNOR, J., concurring in judgment); *id.*, at
107 (STEVENS, J., concurring in part and dissenting in part).
And the phrase is used in the complaint of the minority
plaintiffs in the other § 2 case decided today.   *Houston
Lawyers' Assn.* v. *Attorney General of Texas, post,* p. 419.
App. in Nos. 90–813, 90–974, p. 22a.   In other words, far
from being an impermissible choice, "candidates" would have
been the natural choice, even if it had not been used repeat-
edly elsewhere in the statute.   It is quite absurd to think
that Congress went out of its way to replace that term with
"representatives," in order to convey what "candidates" nat-
urally suggests (viz., coverage of *all* elections) and what
"representatives" naturally does not.

A second consideration confirms that "representatives" in
§ 2 was meant in its ordinary sense.   When given its ordi-
nary meaning, it causes the statute to reproduce an estab-

lished, eminently logical, and perhaps practically indispensable limitation upon the availability of vote dilution claims. Whatever other requirements may be applicable to elections for "representatives" (in the sense of those who are not only elected by but act on behalf of the electorate), those elections, unlike elections for *all* officeholders, must be conducted in accordance with the equal protection principle of "one person, one vote." And it so happens—more than coincidentally, I think—that in every case in which, prior to the amendment of § 2, we recognized the possibility of a vote dilution claim, the principle of "one person, one vote" was applicable. See, *e. g., Fortson* v. *Dorsey,* 379 U. S. 433, 436 (1965); *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966); *Whitcomb* v. *Chavis, supra,* at 149–150; *White* v. *Regester, supra,* at 765–767; see also *Davis* v. *Bandemer, supra,* at 131–132. Indeed, it is the principle of "one person, one vote" that gives meaning to the concept of "dilution." One's vote is diluted if it is not, *as it should be,* of the same practical effect as everyone else's. Of course the mere fact that an election practice satisfies the constitutional requirement of "one person, one vote" does not establish that there has been no vote dilution for Voting Rights Act purposes, since that looks not merely to equality of individual votes but also to equality of minority blocs of votes. (*White* itself, which dealt with a multimember district, demonstrates this point. See also *Mobile* v. *Bolden, supra,* at 65.) But "one person, one vote" has been the premise and the necessary condition of a vote dilution claim, since it establishes the baseline for computing the voting strength that the minority bloc *ought to have.* As we have suggested, the first question in a dilution case is whether the "one-person, one-vote" standard is met, and if it is, the second is whether voting structures nonetheless operate to "'minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Burns* v. *Richardson, supra,* at 88. See also Note, Fair and Effective Voting Strength Under Section 2 of the Voting Rights Act: The

Impact of Thornburg v. Gingles on Minority Vote Dilution Litigation, 34 Wayne L. Rev. 303, 323–324 (1987).

Well before Congress amended § 2, we had held that the principle of "one person, one vote" does not apply to the election of judges, *Wells* v. *Edwards*, 347 F. Supp. 453 (MD La. 1972), aff'd, 409 U. S. 1095 (1973). If Congress was (through use of the extremely inapt word "representatives") making vote dilution claims available with respect to the election of judges, it was, for the first time, extending that remedy to a context in which "one person, one vote" did not apply. *That* would have been a significant change in the law, and given the need to identify some other baseline for computing "dilution," *that* is a matter which those who believe in barking dogs should be astounded to find unmentioned in the legislative history. If "representatives" is given its normal meaning, on the other hand, there is no change in the law (except elimination of the intent requirement) and the silence is entirely understandable.

I frankly find it very difficult to conceive how it is to be determined whether "dilution" has occurred, once one has eliminated *both* the requirement of actual intent to disfavor minorities, *and* the principle that 10,000 minority votes throughout the State should have as much practical "electability" effect as 10,000 nonminority votes. How does one begin to decide, in such a system, how much elective strength a minority bloc *ought* to have? I do not assert that it is utterly impossible to impose "vote dilution" restrictions upon an electoral regime that is not based on the "one-person, one-vote" principle. Congress can define "vote dilution" to be whatever it will, within constitutional bounds. But my point is that "one person, one vote" is inherent in the normal concept of "vote dilution," and was an essential element of the pre-existing, judicially crafted definition under § 2; that Congress did *not* adopt any new definition; that creating a new definition is a seemingly standardless task; and that the word Congress selected ("representative") seems specifically de-

signed to avoid these problems. The Court is stoic about the difficulty of defining "dilution" without a standard of purity, expressing its resolve to stand up to that onerous duty inescapably thrust upon it: "Even if serious problems lie ahead in applying the 'totality of the circumstances' standard described in § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress." *Ante,* at 403. One would think that Congress had said "candidates," rather than "representatives." In reality, however, it is the Court rather than Congress that leads us—quite unnecessarily and indeed with stubborn persistence—into this morass of unguided and perhaps unguidable judicial interference in democratic elections. The Court attributes to Congress not only the intent to mean something other than what it said, but also the intent to let district courts invent (for there is no precedent where "one person, one vote" did not apply that Congress could have been consulting) what in the world constitutes dilution of a vote that does not have to be equal.

Finally, the Court suggests that there is something "anomalous" about extending coverage under § 5 of the Voting Rights Act to the election of judges, while not extending coverage under § 2 to the same elections. *Ante,* at 402. This simply misconceives the different roles of § 2 and § 5. The latter requires certain jurisdictions to preclear changes in election methods before those changes are implemented; it is a means of assuring in advance the absence of all electoral illegality, not only that which violates the Voting Rights Act but that which violates the Constitution as well. In my view, judges *are* within the scope of § 2 for nondilution claims, and thus for those claims, § 5 preclearance would enforce the Voting Rights Act with respect to judges. Moreover, intentional discrimination in the election of judges, whatever its form, is constitutionally prohibited, and the preclearance provision of § 5 gives the Government a method by which to pre-

vent that. The scheme makes entire sense without the need to bring judges within the "to elect" provision.

All this is enough to convince me that there is sense to the ordinary meaning of "representative" in § 2(b)—that there is reason to Congress' choice—and since there is, then, under our normal presumption, that ordinary meaning prevails. I would read § 2 as extending vote dilution claims to elections for "representatives," but not to elections for judges. For other claims under § 2, however—those resting on the "to participate in the political process" provision rather than the "to elect" provision—no similar restriction would apply. Since the claims here are exclusively claims of dilution, I would affirm the judgment of the Fifth Circuit.

\*　　\*　　\*

As I said at the outset, these cases are about method. The Court transforms the meaning of § 2, not because the ordinary meaning is irrational, or inconsistent with other parts of the statute, see, *e. g., Green* v. *Bock Laundry Machine Co.,* 490 U. S. 504, 510–511 (1989); *Public Citizen* v. *Department of Justice,* 491 U. S., at 470 (KENNEDY, J., concurring in judgment), but because it does not fit the Court's conception of what Congress must have had in mind. When we adopt a method that psychoanalyzes Congress rather than reads its laws, when we employ a tinkerer's toolbox, we do great harm. Not only do we reach the wrong result with respect to the statute at hand, but we poison the well of future legislation, depriving legislators of the assurance that ordinary terms, used in an ordinary context, will be given a predictable meaning. Our highest responsibility in the field of statutory construction is to read the laws in a consistent way, giving Congress a sure means by which it may work the people's will. We have ignored that responsibility today. I respectfully dissent.

JUSTICE KENNEDY, dissenting.

I join JUSTICE SCALIA's dissent in full. I write to add only that the issue before the Court is one of statutory construction, not constitutional validity. Nothing in today's decision addresses the question whether §2 of the Voting Rights Act of 1965, as interpreted in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986), is consistent with the requirements of the United States Constitution.