RENDERED: DECEMBER 19, 2024
MODIFIED: DECEMBER 19, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0498-DG

RUSSELL COLEMAN, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF
KENTUCKY

APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2022-CA-0964
JEFFERSON CIRCUIT COURT NO. 22-CI-002816

JEFFERSON COUNTY BOARD OF
EDUCATION; AND ROBBIE
FLETCHER, COMMISSIONER OF
EDUCATION

APPELLEES

**OPINION OF THE COURT BY JUSTICE BISIG**

**<u>AFFIRMING</u>**

The central issue we decide today is whether a statute treating the Jefferson County public school district differently from all other public school districts in the state violates Section 59 of our Kentucky Constitution. The statute at issue without reason deprives the Jefferson County Board of Education of powers available to all other public school districts in the Commonwealth. The same statute, also without reason, deprives all other Kentucky public school superintendents of powers granted to the Jefferson

County superintendent. We therefore agree with the holdings of both the trial court and the Court of Appeals that the statute is unconstitutional.

Before proceeding to address the specific facts at issue, however, we first note unequivocally that it is the role of our elected legislature to make public policy decisions via laws aimed for the betterment of our communities and institutions. This Court should and does give great deference to the propriety of duly enacted statutes. We believe the legislature wants Kentucky to have strong schools. Nonetheless, we are also duty bound to ensure that legislative decisions stay within the important mandates of our Kentucky Constitution. When, as here, that legislative aim is focused on one and only one county without any articulable reasonable basis, the enactment violates Sections 59 and 60 of our Constitution. Reformulating the balance of power between one county's school board and superintendent to the exclusion of all others without any reasonable basis fails the very tests established in our constitutional jurisprudence to discern constitutional infirmity. This decision today upholds our founders' ideal of forbidding even well-intentioned but unreasonable special or disparate treatment of any one specific community.

In oral argument, the Attorney General asserted a holding that SB 1 violates Section 59 would result in the striking down of a litany of other laws, including legislation regulating forms of county government, hotel taxes, police collective bargaining, and boards of health—all of which apply to an articulated class based on city or county class or type. To be clear, there have been in the past—and will be in the future—thoughtful and reasonable legislative policies

that implicate only one object or locale in this Commonwealth. The holding today does not threaten such initiatives. This decision does not present a risk that other statutes legislating on the basis of municipality or county size or status will be deemed unconstitutional.

To the contrary, we do *not* hold today that the General Assembly may *never* enact legislation addressed to only one particular type of county or form of county government, but rather only that it cannot do so *unreasonably.* As will be outlined herein, the fundamental inquiry in a challenge under Sections 59 or 60 is whether there is a reasonably articulable natural and distinctive basis for the limitation of the statute to the articulated class. If so, the statute is allowed. None of the statutes raised by the Attorney General should be deemed so unreasonable as to constitute special or local legislation barred by Sections 59 or 60. With these matters addressed, we turn now to the facts at issue here.

## FACTUAL AND PROCEDURAL BACKGROUND

Our statutes generally provide that in public school districts across the Commonwealth, the school board has "general control and management of the public schools in its district," including "control and management of all school funds and all public school property of its district." Kentucky Revised Statutes ("KRS") 160.290(1). These statutes further provided that the school superintendent acts as "the executive agent of the board" and generally supervises the schools "subject to the control of the board." KRS 160.370(1).

3

Until recently, this statutory scheme applied to *all* Kentucky public school districts. However, in 2022 the General Assembly enacted Senate Bill 1 ("SB 1"), a statute granting less powers to the board—and greater powers to the superintendent—of a school district in "a county school district in a county with a consolidated local government." KRS 160.370(2). The Jefferson County public school district is the only such district in the state. Thus, under the statute, while the Jefferson County superintendent enjoys *exclusive* authority over "the general conduct of the schools, the course of instruction, the discipline of pupils, . . . and the management of business affairs," his counterpart in McCracken County only enjoys such authority "subject to the control of the board of education." *Compare* KRS 160.370(2)(b)(3) *and* KRS 160.370(2)(a). While the Jefferson County superintendent enjoys the ability to implement rules, regulations, bylaws, and statements of policy so long as a super-majority of the school board does not vote against them, those proposed by his counterpart in Pulaski County fail if even half the school board disagrees. *Compare* KRS 160.370(2)(b)(2) & KRS 160.370(2)(a). And while the Jefferson County superintendent may approve a purchase of $250,000, his counterpart in Boyd County enjoys no such authority. For reasons unknown, the statute also forbids the Jefferson County school board from meeting more than once every four weeks. KRS 160.370(2)(a)(2). Notably, the statute offers no indication as to why these particular adjustments are beneficial for a county school district in a county with a consolidated local government. Nor does the

4

statute speak to any reason why its adjustments are *not* beneficial in other types of school districts.

The Jefferson County Board of Education brought suit alleging that SB 1 violates Section 59 of the Kentucky Constitution.[1] That provision mandates in relevant part that the General Assembly may not pass any "local or special acts" regarding "the management of common schools," nor may it enact a special law in any case "where a general law can be made applicable." Ky. Const. §§ 59(25), (29). The Jefferson Circuit Court and the Court of Appeals both found the statute unconstitutional. We agree with the conclusions of the trial court and the Court of Appeals and therefore affirm.

## ANALYSIS

Before proceeding to the merits, we first address the unique procedural posture of this case. It will be easy fodder for those unhappy with today's decision to argue it is due to nothing more than a change in the composition of this Court. But any such criticism is premised solely on a fundamental misunderstanding of our Rules governing the granting of a rehearing. Those Rules provide that rehearing may be granted when, among other things, it appears the Court has "overlooked . . . a controlling statute." Rule of Appellate Procedure ("RAP") 43(B)(1)(a). Here, the Jefferson County Board of Education asserted in its petition for rehearing that the Court incorrectly concluded the

---

[1] Each of the challenged sections of SB 1 is located in Section 3 of that Bill. Though for shorthand purposes we refer to the challenged sections collectively as "SB 1" throughout this Opinion, we do not intend in any way to address the constitutionality or validity of the remaining Sections of SB 1.

5

class set forth in SB 1 is "open" and thus withstands scrutiny under Section 59. More particularly, the Board contended that the class is in fact "closed" because it would be statutorily impossible for any other county to adopt the "consolidated local government" form and thus become subject to SB 1. Although we conclude after rehearing that the more appropriate consideration for this type of case is the reasonableness of the class rather than its status as "open" or "closed," rehearing was nonetheless properly granted to consider the purported statutory bar referenced by the Board in its rehearing petition.

Rehearing is also warranted "when it appears that the court . . . has misconceived . . . the law applicable to the case." *Id.* The Court's original Opinion in this case applied the Section 59 test articulated in *Calloway County Sheriff's Department v. Woodall*, 607 S.W.3d 557 (Ky. 2020). However, it did not apply other important aspects of our long-standing Section 59 jurisprudence. As discussed in further detail below, these standards remain good law and thus rehearing was appropriate to consider their import for this matter.

Finally, rehearing is also warranted "in extraordinary cases when justice demands it." RAP 43(B)(1)(a). The present case involves allegations of unreasonable disparate treatment of the largest school district in the Commonwealth. It is a matter of statewide interest as it relates not only to a reduction of the Jefferson County Board of Education's powers, but also a denial to every other public school superintendent in the Commonwealth of extra powers afforded to the Jefferson County superintendent. It is thus a

6

matter of significant concern to all citizens of the Commonwealth, as it fundamentally affects the governance of public schools and thus the education of Kentucky's children. As such, it is the type of exceedingly rare but nonetheless "extraordinary" case that justice demands be reconsidered to determine whether the correct laws and standards have been discerned and applied.

Having thus addressed the propriety of rehearing, we now turn to the merits, reviewing this constitutional challenge *de novo*. *Louisville/Jefferson Cnty. Metro Gov't v. O'Shea's-Baxter, LLC*, 438 S.W.3d 379, 382 (Ky. 2014) ("The application of constitutional standards is a question of law which we review de novo.").

### I. Appropriate Test for Section 59 and 60 Challenges.

The Jefferson County Board of Education challenges SB 1 solely on the ground that it constitutes special and local legislation in violation of Sections 59 and 60 of the Kentucky Constitution. Thus, we must first consider the appropriate test for resolving such challenges.

Sections 59 and 60 set forth a constitutional prohibition against the passage of special or local legislation. These provisions serve, among other things, to guard against legislation that either unfairly provides a community preferential treatment, or that unfairly targets a particular community for adverse treatment. A "local or special" act is one that either affects only a single person, place, or locale, or that arbitrarily discriminates against some persons, places, or things and favors others. *Bd. of Educ. of Jefferson Cnty. v.*

7

*Bd. of Educ. of Louisville*, 472 S.W.2d 496, 498 (Ky. 1971). Of particular relevance to this case, Section 59(25) specifically provides that "[t]he General Assembly shall not pass local or special acts . . . [t]o provide for the management of common schools." Section 59 also contains a catch-all provision which mandates that in any case "where a general law can be made applicable, no special law shall be enacted." Ky. Const. § 59(29).

In *Calloway County Sheriff's Department v. Woodall,* we explained that legislation violates Sections 59 and 60 when it "applies to a particular individual, object or locale." 607 S.W.3d at 573. However—and with the benefit of further clarity upon rehearing—it is important to keep in mind the context in which we articulated that test. *Woodall* involved a challenge to a worker's compensation statute that limited a lump-sum death benefit to cases where death occurred within four years of the workplace injury. *Id.* at 561. The worker's compensation benefit scheme requires the drawing of numerous lines—*i.e.* the creation of numerous classes of benefit recipients—to achieve the underlying goals of the program. The limitation of lump-sum death benefits to a certain timeframe was one such line. In that context, we thus noted that the appropriate test for determining whether the statute violated Section 59 was to consider "whether the statute applies to a particular individual, object or locale." *Id.* at 573. Here, SB 1 applies only to the Jefferson County school district and therefore may not pass this test.

As a more general matter, however, we must also consider the reasonableness of a statutorily drawn class. Indeed, this consideration is a

8

central and indeed necessary factor in determining whether the statute violates Sections 59 or 60. This Court recognized as much shortly after the adoption of our present Constitution:

> "**Whether or not an act . . . is a general or special law, depends fundamentally upon a question of classification**. When an act is assailed as class or special legislation, the attack is necessarily based upon the claim that there are persons or things similarly situated to those embraced in the act, and which by the terms of the act are excluded from its operation. The question then is whether the persons or things embraced by the act form by themselves a proper and legitimate class with reference to the purposes of the act."

*Droege v. McInerney*, 120 Ky. 796, 87 S.W. 1085 (1905) (quoting 1 Sutherland on Statutory Construction § 203) (emphasis added). And this remains the leading view today. *See Zuckerman v. Bevin*, 565 S.W.3d 580, 600 (Ky. 2018) (noting that for a statutorily drawn classification to survive a Section 59 or 60 challenge, there must be "distinctive and natural reasons inducing and supporting the classification."); Sutherland Statutory Construction § 40:4 (8th ed. 2024) (noting that "classification is the real heart of the special legislation doctrine.").

Thus—and unsurprisingly—Kentucky courts faced with a Section 59 or 60 challenge have long considered whether the challenged legislation is based upon a class that bears a reasonable and natural relationship with the underlying statutory purposes and objectives. Indeed, our long-standing standard for Section 59 challenges as set forth in *Zuckerman* reflects this core consideration:

> Our case law has long recognized a simple, two-part test for determining whether a law constitutes general legislation in

9

its constitutional sense: (1) equal application to all in a class, and (2) distinctive and natural reasons inducing and supporting the classification.

565 S.W.3d at 600. Moreover, and as noted above, the reasonableness of a statutorily drawn class is in any event a core consideration in determining special and local legislation challenges. As such, and in an expansion of the test set forth in *Woodall*, we reaffirm today that consideration of the reasonableness of a statutorily drawn classification generally remains the appropriate standard for challenges to legislation under Sections 59 and 60 of the Kentucky Constitution

Thus, when faced with a challenge to legislation under Sections 59 or 60, we ask whether there is any articulable natural and distinctive reason for the class distinctions drawn by the legislature. Of course, this inquiry must be made with reference to the underlying legislative purposes and objectives. Indeed, as former Chief Justice Minton, joined by Justices Hughes and Venters, noted in his concurrence in *Zuckerman*, we must ask a series of questions in Section 59 challenges specifically aimed at determining the reasonableness of the statutorily drawn classification vis-à-vis the underlying statutory purposes and objectives:

- "What is the 'condition' the legislature is attempting to remedy?" *Id.* at 608-09.

- "Why is the legislature treating one class differently from another?" *Id.*

- "Why is the legislature treating some members of the class differently from others?" *Id.*; and

10

- "Does the legislature have good reasons for doing all of this?" *Id.*

Accordingly, where we can perceive that a statutorily drawn classification reasonably furthers the underlying statutory purposes and objectives, the statute does not violate Sections 59 or 60. As an illustration to demonstrate this concept, it would be reasonable for the legislature to provide funding for an additional college admissions guidance counselor in any high school where at least 50% of students do not apply to college. Such a provision would be reasonable because there is a natural and distinctive reason to provide funding for an additional counselor to the class of "high schools where at least 50% of students do not apply to college"—namely to further the statutory purpose of increasing college application rates by supplying an additional counselor. Simply stated, because the class-based solution reasonably matches the problem, the legislation would not violate Sections 59 or 60. In sum, where we can perceive a natural, distinctive, and reasonable relationship between a statutorily drawn class and the problem the legislation seeks to address or the benefit it seeks to promote, the statute will not be found to violate Sections 59 or 60.

Having thus articulated the proper test for resolution of the Board's Section 59 challenge, we must next consider the proper burden of proof and evidentiary standard to be applied in such a challenge. Understandably, the *Woodall* Court was uncomfortable with *Tabler v. Wallace*, 704 S.W.2d 179 (Ky. 1985), a Section 59 case which deviated from the usual burdens of proof and evidentiary standards otherwise generally applied in the course of

11

constitutional adjudications. *Woodall*, 607 S.W.3d at 569. We agree with *Woodall's* critiques of *Tabler* and reiterate today that in Section 59 and 60 challenges, the government enjoys an initial presumption that the challenged legislation is constitutional. The party challenging the legislation bears the initial burden of demonstrating that there is no reasonably articulable basis to conclude the classification drawn by the legislature is a natural and distinctive means of achieving the desired legislative ends. Once such a showing is made, the government of course may rebut it by demonstrating the existence of *any* reasonably articulable natural and distinctive basis—whether or not it was the *actual* basis for passage of the law.

In sum, the appropriate test for a challenge under Sections 59 or 60 is whether there is any reasonably articulable natural and distinctive basis for the class distinctions drawn by the legislature. This standard will be judicially workable, will not lead to uncertainty, and will respect the separation of powers integral to our tripartite form of government. Indeed, one need look no further than the extensive body of law in which courts across the country have successfully analyzed equal protection challenges to statutory schemes to see that these standards function well. *See Zuckerman*, 565 S.W.3d at 609 (Minton, C.J., concurring) (noting that the special and local legislation analysis demands consideration of the reasons for statutorily drawn classifications, and that "such an analysis is in exact conformance with an Equal Protection Clause analysis."); *see also Weiand v. Bd. of Trustees of Ky. Ret. Sys.*, 25 S.W.3d 88, 93 (Ky. 2000) ("Under the rational basis test, a classification must be upheld

12

against an equal protection challenge if there is *any reasonably conceivable state of facts that could provide a rational basis for the classification.*") (emphasis added) (quotation omitted).  The equal protection standards have been judicially workable, have not led to uncertainty, and have not upset the separation of powers in that context.  We thus have little reason to fear these similar standards will do so when applied to challenges arising under Sections 59 and 60 of our Constitution.[2]

## II.     The Class Articulated in SB 1 is Not Reasonable and Violates Section 59 of the Kentucky Constitution.

Having thus determined that the relevant standard for challenges to legislation under Sections 59 or 60 is whether there are reasonably articulable natural and distinctive reasons for the class distinctions drawn by the legislature, we must consider whether such reasons exist to support the General Assembly's limitation of SB 1 to "a county school district in a county with a consolidated local government."  The Board has made a prima facie showing that there is no reasonably articulable distinctive and natural basis for such a limitation.  Nothing on the face of the statute suggests that its alteration of the usual superintendent-school board relationship is well-suited *only* to a county school district, and then *only to* one located in a county with a

_____

[2] The trial court here *sua sponte* determined that SB 1 also violates equal protection.  The Board has not pressed that argument before this Court, and we therefore do not consider it further.

13

consolidated local government.  Nor does the statute suggest why its scheme would *not* also be well-suited to other types of school districts.[3]

For example, we are offered no insight into why an independent school district in a county with a consolidated local government would not benefit from the board-superintendent relationship set forth in SB 1.[4]  Nor why county school districts in counties without a consolidated local government should not be provided whatever benefits the statute might offer.  Nor can we independently perceive any reason SB 1 should be limited to only a county school district, and then only when located in a county with a consolidated local government.  Indeed, because school boards are subdivisions of the Commonwealth, there appears to be no significant relationship between their appropriate duties and responsibilities and the form of county government adopted by the county in which they happen to be located.  *See Yanero v. Davis*, 65 S.W.3d 510, 527 (Ky. 2001) (holding that a school board is "an agency of state government").  In sum, the record is devoid of any reasonably articulable natural and distinctive reasons for the General Assembly's limitation of SB 1 to only "a county school district in a county with a consolidated local government."

Absent any explanation as to how SB 1 actually benefits the Jefferson County school district, and as to why the powers SB 1 affords the Jefferson

---

[3] Notably, those portions of SB 1 other than the provisions challenged here address school governance and related matters but apply statewide.

[4] The Anchorage Independent Schools is one such district.

County superintendent should not be extended to other school superintendents, we must reach the conclusion that the statute violates Section 59. The statute plainly provides a scheme for the management of common schools, yet limits that scheme without a reasonable and natural basis to only "a county school district in a county with a consolidated local government." It thus violates Section 59's specific and binding mandate forbidding the General Assembly from enacting special or local legislation providing "for the management of common schools." Ky. Const. § 59(25). Moreover, because there appears no reason SB 1 could not be applied more broadly to all school districts, it also violates Section 59's command that in any case "where a general law can be made applicable, no special law shall be enacted." *Id.* § 59(29).

We also note that the present case is distinguishable from *Board of Education of Louisville v. Board of Education of Jefferson County*, 522 S.W.2d 854 (Ky. 1975), because while the legislation at issue there was aimed at problems unique to a large urban school district, SB 1 is not. In that case, the Court upheld a statute providing a unique school district merger process for Jefferson County because the larger student population and property holdings, more extensive financing requirements, and ethnic minority enclaves of a first-class city's large urban area warranted such a process. *Id.* at 856-58. In other words, the statute's differential treatment was reasonably aimed at addressing problems unique to the more urban first-class city area, and would have made little sense in smaller communities that did not face those same challenges. *Id.*

15

at 858. ("The same need for this presumably will not be as great in the case of the merger of a small independent district with the county district, *which fact justifies the differentiation made by the legislation . . . .*") (emphasis added).

Turning back to the present case, rather than addressing challenges unique to the urban environment of Jefferson County, SB 1 simply shifts power from the school board to the superintendent. The Attorney General offers in his briefing that SB 1 is justified by a purported need to allow the Jefferson County school superintendent to "proactively and creatively address intractable issues like student performance, student discipline, the dropout rate, busing, and school assignment." Aside from school assignment, however, none of these school-related issues are unique to Jefferson County or a product solely of its unique large urban environment. Surely superintendents across the state would like to have greater power to address student performance, student discipline, dropout rates, and busing. Yet we are offered no explanation as to why SB 1 deprives them of the ability to do so. As for school assignment, we are likewise provided no explanation or evidence that it presents challenges so severe as to warrant the entire restructuring of the board-superintendent relationship. Certainly, a statute limited to Jefferson County that is reasonably aimed at solving problems unique to Jefferson County would not violate Sections 59 or 60—but SB 1 is not such a statute.

Moreover, we fail to see—and are not pointed to—any explanation as to how the usual superintendent-board relationship inhibits efforts to address these common school issues, nor as to how the altered superintendent-board

16

relationship set forth in SB 1 operates as a cure—much less a cure warranted by the unique challenges faced by a large urban school district. Quite simply, while limitation of the school district merger process addressed in the previously discussed *Board of Education of Louisville* case was reasonably related to the unique issues facing a large urban school district, SB 1 neither addresses issues unique to such districts nor is warranted by the unique challenges facing such districts.

We do not reach this conclusion lightly. In point of fact, we note that the government has had numerous opportunities to offer any reasonably articulable natural and distinctive basis for the class distinctions drawn in SB 1. However, it has offered none. It offered none before the trial court or the Court of Appeals. It offered none during this Court's first hearing of oral argument on this case. Finally—and despite being provided a second oral argument before this Court—it also offered none on rehearing. We thus unequivocally and firmly conclude that SB 1 violates Section 59.

We also do not intend this decision to offer any opinion on the wisdom of the policy decisions reflected in SB 1. Those decisions were surely well-intended and may even be wise, or they may be unwise, but that judgment is not ours to make; rather, our limited duty is solely to consider whether the statute complies with or violates the Kentucky Constitution. *Shaw v. Fox*, 246 Ky. 342, 55 S.W.2d 11, 15 (1932) ("[N]or will the courts inquire into and consider the practicability, the expediency, or the wisdom of the enactment.

The only question to be determined by the court is one of constitutional inhibition, limitation, or restriction.") (citation omitted).

Yet when we are confronted with a law that violates the limitations set forth in our Constitution, we are unquestionably bound to declare the law unconstitutional and void:

> The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it.  It is *solely* the function of the judiciary to do so.  This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.

*Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 208 (Ky. 1989).  In so doing, we do not encroach upon the powers of the legislature, but rather we meet our duty of ensuring that the Commonwealth is served by a government operating within the long-standing constitutional constraints set forth by its citizens, from whom all power of governance derives.  *Id.* at 209 ("To avoid deciding the case because of 'legislative discretion,' 'legislative function,' etc., would be a denigration of our own constitutional duty.  To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.").

We also again reiterate that our holding today will not upset any reasonable classification-based legislation, including legislation involving classifications on the basis of municipality or county size or status.  To the contrary, our prior case law and our holding today make clear that only *unreasonable* legislation on the basis of county class or size may be found to

18

violate Sections 59 and 60. In contrast, legislation limited to only particular counties or types of counties has repeatedly been found permissible so long as the limitation bears some reasonable relationship with the underlying legislative purposes and objectives.

For example, in *Sims v. Board of Education of Jefferson County, Ky.*, the legislature passed an act allowing a "board of education containing a city of the first class" to impose occupational license fees. 290 S.W.2d 491, 493 (Ky. 1956). The statute was challenged as special legislation in violation of Section 59. This Court disagreed, holding that because there was a "reasonable basis" for limiting the statute to the articulated class—namely the significant additional school building and salary expenses faced by the Jefferson County school board—the legislation was permissible. Similarly, as noted above, the statute setting forth a different school district merger process for Jefferson County was upheld because it was reasonably related to the underlying statutory purposes and objectives of addressing issues unique to Jefferson County. *Bd. of Ed. of Louisville*, 522 S.W.2d at 857; *see also Shaw v. Fox*, 246 Ky. 342, 55 S.W.2d 11, 16 (1932) (rejecting Section 59 challenge to law applicable only to "counties containing a population in excess of two hundred fifty thousand" because "[t]he population and *the facts and conditions presented undoubtedly authorized and justified* the Legislature to make the classification and adopt the act to avoid or prevent, in the future, the evils thereof.") (emphasis added). Quite simply, Sections 59 and 60 prohibit only legislation based upon class distinctions that bear no reasonable relationship

19

to the underlying legislative purposes and objectives. Though SB 1 is such a statute, we see little merit to the contention that our holding today will result in the striking down of any reasonable legislation.

## CONCLUSION

Today we remain both steadfast in our strict observance of the separation of powers and mindful of our duty of judicial modesty to respect the acts of the General Assembly and afford them the presumption of constitutionality they deserve. Nonetheless, we also cannot allow this modesty to blind us to our solemn obligation to safeguard the rights of the citizens of this Commonwealth to government in conformity with the limitations set forth in our Constitution. One of the primary purposes of Sections 59 and 60 is to ensure that legislation affecting individual communities is reasonable and drawn with an eye towards its intended legislative purposes and objectives. These provisions thus protect the fair treatment of all communities by prohibiting an unreasonably favorable treatment of one community, or an unreasonably adverse treatment of another.

It is undisputed here that the challenged provisions of SB 1 treat the Jefferson County public school district differently than all other public school districts within the Commonwealth. The statute deprives the Jefferson County Board of Education of powers held by all other public school boards across the state, and provides the Jefferson County superintendent with additional powers denied to all other public school superintendents across the state. The statute imposes this disparate treatment without explanation, and the Board

20

has shown that there is no reasonably articulable natural and distinctive basis for doing so. Regretfully—and despite having several opportunities—the Attorney General has failed to meet the Board's showing with any reasonable explanation of an articulable basis for the limitation of the statute to only "a county school district in a county with a consolidated local government." Accordingly, because the Jefferson Circuit Court and the Court of Appeals therefore correctly concluded that SB 1 violates Section 59 of the Kentucky Constitution, the judgments of those courts are affirmed.

All sitting. Goodwine, Keller, and Thompson, JJ., concur. Nickell, J., dissents by separate opinion in which Lambert, C.J., and Conley, J., join.

NICKELL, J., DISSENTING: The rehearing of the Court's original majority opinion,[5] legitimately rendered December 19, 2024, was improvidently granted. The Board's petition for rehearing failed to satisfy our Court's historic legal standard for granting such requests, and nothing changed other than the Court's composition, which resulted in a contrary holding on the merits by a new majority of justices. Therefore, because the appeal should not have been reheard, I dissent.

The parties exhaustively briefed and litigated the dispositive legal issues on the original merits review and the original majority opinion did not misconceive any issue of law or fact sufficient to justify the new majority's abrupt midstream turnabout. No matter of legal consequence has changed

---

[5] *Coleman v. Jefferson Cnty. Bd. of Ed.*, 2023-SC-0498-DG, 2024 WL 5180457 (Ky. December 19, 2024).

between the original decision rendered in this appeal and the present decision "except perhaps a change in the membership of the court."[6] *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 179 (Ky. 1989) (Vance, J., dissenting).

To be clear, the grant of rehearing in this appeal was premised on nothing more than the mere happenstance of the new majority's sudden and newfound ability to overrule *Calloway Cnty. Sheriff's Dept. v. Woodall*, 607 S.W.3d 557 (Ky. 2020). However, a change in the membership of this Court, taken alone, does not legitimize the reconsideration of precedent, much less the rehearing of a particular decision on appeal. *Parker v. Webster Cnty. Coal, LLC*, 529 S.W.3d 759, 771 (Ky. 2017) (Minton, C.J., concurring in part, dissenting in part). Plainly, the bare inclination of the new majority to reach a contrary result regarding the merits of the present appeal does not satisfy our stringent and well-established standard for the grant of rehearing under RAP[7] 43(B)(1)(a).

In my view, the new majority's grant of rehearing has taken result-oriented decision-making and disregard of well-established procedural rules to a new level of "judicial fog." *Tabler v. Wallace*, 704 S.W.2d 179, 188 (Ky. 1985) (Stephenson, J., dissenting). Agreeing this Court must "not countenance an evasion or even an unintentional avoidance" of fundamental law as established in Kentucky's Constitution, Justice Stephenson wisely observed the same "lofty

---

[6] While this decision involved the impropriety of changing precedent based solely on a change in the membership of the court, it applies with equal force to the present grant of rehearing.

[7] Kentucky Rules of Appellate Procedure.

sentiment about the constitution . . . should apply equally to a rule of law." *Id.* (Stephenson, J., dissenting).

As relates to the present matter, the rule of law in Kentucky includes adherence to controlling procedural standards strictly limiting reconsideration of rendered judicial opinions. Applying Justice Stephenson's wisdom, any intentional disregard or inventive avoidance of such procedural mandates by a new majority of a reconfigured Court to achieve a preferred opposite outcome to the legitimately decided merits of a particular controversy reduces the foundational principle of the rule of law to a mere "selective system" to be applied only "when it feels good" to fluctuating majorities of the Court's justices, *id.* at 189, thereby reasonably damaging perceptions of judicial independence and diminishing public trust in the court system's fair and impartial administration of justice. Therefore, I stand by the original majority's decision on the merits and would dismiss this rehearing as improvidently granted.

## LAW AND ANALYSIS

### A. Standard for Rehearing under RAP 43(B)(1)(a).

Lest the remaining justices comprising the original majority, who uniformly voted to deny rehearing,[8] be consigned to the "unhappy"[9] lot of those

---

[8] Interestingly, the Supreme Court of the United States will not grant a petition for rehearing on the merits unless at least one Justice from the original majority agrees. Rules of the Supreme Court of the United States 44.1.

[9] *Ante*, at 5 ("It will be easy fodder for those unhappy with today's decision to argue it is due to nothing more than a change in the composition of this Court. But

who labor under "a fundamental misunderstanding of our Rules governing the granting of rehearing[,]"[10] I will endeavor to fully elucidate the proper application of the rehearing standard to the facts of this appeal.

Kentucky's RAP 43(B)(1)(a) sets forth the well-defined requirements for rehearing as follows:

> (1) When Petition for Rehearing Authorized.  A party affected by an Opinion or Opinion and Order of the Supreme Court or Court of Appeals in an appealed case may petition the Court for the following relief:
>
> (a) Rehearing. **Except in extraordinary cases when justice demands it**, a petition for rehearing **shall be limited to a consideration of the issues argued on the appeal** and will be **granted only when it appears that the court has overlooked a material fact in the record, or a controlling statute or decision, or has misconceived the issues presented on the appeal or the law applicable thereto.**

(Emphasis added).  By design, "the grounds on which a petition for rehearing will be granted are extremely limited."  Griffin Terry Sumner & Jason P. Renzelmann, 19 *Ky. Prac. Appellate Prac.* § 17:2 (2025).

Under the foregoing Kentucky standard, the Court should not grant rehearing to merely allow a losing litigant to "**reargue issues and law** that were raised in the original appeal."  David V. Kramer, 7 *Ky. Prac. R. Civ. Proc. Ann.* Rule 76.32 n.2 (2025) (construing prior version of RAP 43) (emphasis added).  Instead, "[a] rehearing may be granted where the opinion was based on the wrong principle of law or misconstrued a material fact."  *Id.*  Thus, a petition

---

any such criticism is premised solely on a fundamental misunderstanding of our Rules governing the granting of a rehearing.").

[10] *Id.*

24

for rehearing will not lie where a party merely seeks a different result. On the contrary, a well-founded petition must rest on legal issues the appellate court "may have failed to address or may have **misunderstood**." *Easley v. Reuss*, 532 F.3d 592, 593 (7th Cir. 2008) (emphasis added). Indeed, "[i]n case after case we have held that the original opinion will not be disturbed simply because the petitioner believes that the issue has been erroneously decided." *Hawkins v. Sunmark Indust., Inc.*, 727 S.W.2d 397, 401 (Ky. 1986) (Leibson, J., dissenting).

Additionally, the Kentucky standard allows "a narrow exception that applies only 'in extraordinary cases when justice demands it.'" Sumner & Renzelmann, 19 *Ky. Prac. Appellate Prac.*, at § 17:2. This limited exception, however, is akin to palpable error review. *Deemer v. Finger*, 817 S.W.2d 435, 438 (Ky. 1990) (Wintersheimer, J., dissenting). A palpable error is one that is "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (quoting *Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1997)). Moreover, "[a] palpable error must be so grave in nature that if it were uncorrected, it would seriously affect **the fairness** of the proceedings." *Id.* (citing *Ernst v. Commonwealth*, 160 S.W.3d 744, 758 (Ky. 2005) (emphasis added)). In other words, a palpable error results in manifest injustice to the extent that the "defect in the proceeding was **shocking or jurisprudentially intolerable**." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006) (emphasis added).

25

**B. The Rehearing of this Appeal was Improvidently Granted.**

The rehearing of this appeal was improvidently granted because the Board had every opportunity to present its arguments fully and fairly during the original merits review. The original majority simply did not accept the Board's view of the law, and the resulting decision should have ended the matter because "[a]rguments presented in the appellate brief and not overlooked, but considered and rejected by the court in the original hearing, are not grounds for a rehearing." 5 C.J.S. *Appeal and Error* § 800 (2025).

Evading the clear boundaries established under RAP 43(B)(1)(A), the new majority opinion advances three justifications in support of its grant of rehearing in the present appeal. *Ante*, at 5-7. First, the new majority posits the original majority appeared to overlook a controlling statute relative to whether SB 1 applies to an open class. *Id.* at 5-6. Second, the new majority asserts the original majority misconceived the applicable law by failing to consider "other important aspects of our long-standing Section 59 jurisprudence." *Id.* at 6. And third, the new majority claims justice demands the rehearing of this appeal to ascertain whether "the correct laws and standards were discerned and applied." *Id.* at 7. As will be demonstrated, each of these rationales are specious, providing mere fallacious pretext for the grant of a conspicuously result-driven rehearing.

**1. The original majority did not overlook a controlling statute.**

First, the original majority did not overlook any controlling statutes. As a preliminary matter, in granting the Board's petition for rehearing, the new

26

majority relied upon the Board's assertion that in concluding SB 1 applied to an open class the new majority overlooked a controlling statute which made it "statutorily impossible" for any other county to fall within the ambit of SB 1. *Id.* Curiously, however, the new majority opinion fails to identify or analyze the particular controlling statute purportedly overlooked by the new majority.

Such a glaring analytical omission logically evinces the new majority must have ultimately deemed any purported "overlooked" statutes to have been irrelevant to its holding. *Ante*, at 6. However, if any ostensibly "overlooked" statute was not truly pertinent to the outcome of this appeal, then rehearing should not have been granted because any such statutes were not, in fact, "controlling," as required by RAP 43(B)(1)(a).

Putting aside this foundational analytical infirmity, the record establishes that in reaching its rendered opinion, the original majority had weighed extensive statutory and precedential authority and opposing legal argument concerning the constitutionality of SB 1 before squarely addressing the issue. Particularly, the Commonwealth had specifically argued that SB 1 is a general statute because it "applies to an open class" encompassing "*any* consolidated local government that exists *now* or *in the future*." To support this contention, the Commonwealth had cited KRS 67C.101, KRS 81.005, and KRS 83A.160(6) to assert "[n]othing in Kentucky law prevents the largest city by population in any other Kentucky county with more than 250,000 residents from choosing to become a city of the first class."

27

Without contradicting the Commonwealth's assertion that SB 1 applies to an open class, the Board countered in its initial brief by claiming "the essential inquiry" under *Woodall* was not whether SB 1 should be classified as open or closed, but rather "is whether the challenged statute *does now* apply only 'to a particular individual, object or locale.'" The Board argued, because Jefferson County is the only county to which SB 1 currently applies, the legislation's plain language and history compelled a conclusion that "[i]t only applies to one district in the Commonwealth[.]"

Impartially weighing the opposing arguments and forthrightly analyzing the full panoply of considerations required under the controlling legal authority of *Woodall* and legal principles gleaned from the caselaw upon which *Woodall* relied,[11] the original majority opinion fairly considered, but explicitly rejected, the Board's contention that SB 1 violated the constitutional prohibition on special legislation because Jefferson County was currently the only county to which SB 1 could apply. *Coleman*, 2024 WL 5180457 at *8. Thus, it cannot truthfully be said, nor in good faith asserted, that SB 1's constitutionality was not comprehensively raised, argued, considered, and decided upon during the original merits review, and for this reason rehearing was improvidently granted.

Nonetheless, in petitioning for rehearing and a reversal of the original merits holding, the Board complained the original majority applied a "wholly new" test based on the distinction between open and closed classes to reach

---

[11] *See, e.g.*, *Winston v. Stone*, 102 Ky. 423, 43 S.W. 397, 398 (1897), overruled on other grounds by *Vaughn v. Knopf*, 895 S.W.2d 566 (Ky. 1995))

28

this conclusion. Additionally, the Board asserted, for the first time, that it was statutorily impossible for any other county to fall within the scope of SB 1, thereby asserting the legislation impermissibly pertained to a closed class under the test adopted under *Woodall.*

Contrary to the Board's argument, however, the original majority opinion faithfully applied the *Woodall* test and had correctly noted in the original opinion that the open or closed class distinction has been recognized and applied by Kentucky courts in the context of Section 59 since the time of the Founding Era. *Id.* (citing, e.g., *Winston*, 43 S.W. at 398). In addition, another early decision of our predecessor Court rejected a strikingly similar argument under Section 59 and explained:

> This section appears in the act incorporating cities of the first class, without any reference to the city of Louisville. True, it doubtless applies to her being in that class; but by its terms, intent, and meaning, **it would apply** equally to other cities, if there were any other in that class. And yet appellants' counsel argue that the court must judicially know that there was no other city in Kentucky, in the first class, than the city of Louisville, and that, therefore, the statute can apply only to the city of Louisville, and hence is obnoxious to the provision of the constitution (section 59) against special legislation. We confess we are not so impressed with the soundness of this reasoning[.]

*Long v. City of Louisville*, 97 Ky. 364, 30 S.W. 987, 990-91 (1895) (emphasis added). Thus, the original majority's inclusion of the open or closed class distinction within its exhaustive legal analysis could not have reasonably surprised the Board, and the Board's argument that the original majority failed to properly apply *Woodall* is simply without merit.

29

Dispelling any doubt that the Board's now repackaged position was not fully considered by the original majority, it is likewise noteworthy that the original dissenting opinion had voiced essentially the same theme urged in the Board's original brief, asserting:

> [t]he *Woodall* Court made no mention of any distinction between 'open' versus 'closed' classes, but rather plainly stated its test as being whether the statute applies—present rather than future tense—to only one person, place, or thing. Had the Court wished to say otherwise, it could have—but did not.

*Coleman*, 2024 WL 5180457, at *34 (Bisig, J., dissenting).  However, such a narrow or closed "present tense" reading of *Woodall* ignores the interpretive principle that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).  Instead, judicial "opinions dispose of discrete cases and controversies and they must be read with a careful eye" toward the factual and legal context. *National Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023).

The fact that the proper interpretation of *Woodall* was argued in the original briefs and addressed in the original dissent undeniably establishes the original majority did not overlook or misconceive this issue, thereby mandating the denial of rehearing in accordance with RAP 43 B)(1)(a).  Indisputably, the original majority adjudicated the opposing legal perspectives relative to the application of *Woodall* and rejected the views espoused by the Board and original dissenting opinion on the merits.

30

More particularly, any claim that it is statutorily impossible for SB 1 to apply to other counties besides Jefferson County must also fail. A review of the applicable statutes, cited by the Commonwealth in its original brief, confirms that SB 1 applies to an open class.

KRS 67C.101(1) permits "any city of the first class . . . [to] be consolidated with . . . the county containing the city" upon the approval of the voters. KRS 81.005 governs the classifications of cities and distinguishes between first-class cities and home rule cities based on the form of local government. Cities of the first class are defined as "cities organized and operating under the mayor-alderman plan of government in accordance with KRS Chapter 83" while home rule cities operate under the following forms of government:

> 1. City manager plan of government in accordance with KRS 83A.150;
>
> 2. Mayor-council plan of government in accordance with KRS 83A.130; or
>
> 3. Commission plan of government in accordance with KRS 83A.140.

KRS 81.005(1)(a)-(b).

Additionally, KRS 81.005(5) contemplates the ability of Kentucky cities to change class and provides, "[w]hen a city changes class, it shall thereafter be governed by the laws relating to the class to which it is assigned[.]" More particularly, KRS 83A.160(6) provides:

> Any city with the largest population located in a county with a population equal to or greater than two hundred fifty thousand (250,000) based upon the most recent federal

31

> decennial census may elect to become organized and governed under the mayor-alderman plan of government provided in KRS 83.410 to 83.660 by popular vote in accordance with KRS 83A.120. The process for the adoption of the mayor-alderman plan of government shall be governed by subsections (2) to (5) of this section.

(Emphasis added).

Thus, the Board's argument in its petition for rehearing that "the classification of 'city of first class' is closed under Kentucky law" because "[t]he only forms available prospectively are those available to 'home rule cities'" is clearly incorrect. Further, the Board's failure to address this issue in its supplemental brief on rehearing should have resulted in a waiver because a party's failure to brief an issue results in the abandonment of that issue. *CSX Transp., Inc. v. Moody*, 313 S.W.3d 72, 88 (Ky. 2010).

Improperly shifting from its position as stated in the petition for rehearing, the Board now argues in its supplemental brief that it is merely "extremely unlikely," rather than "impossible," that any other county would ever become subject to SB 1. Clearly, the Board's unseasonable admission does not support a different result on rehearing because the original majority acknowledged this precise argument, explaining:

> [w]hile it is not probable that another city will qualify as a first-class city in Kentucky at any time in the immediate future, nevertheless, it is always possible and the statute would then be applicable to more than one county.

*Coleman*, 2024 WL 5180457, at *8 (quoting *Sims v. Bd. of Ed. of Jefferson Cnty*, 290 S.W.2d 491, 495 (Ky. 1956)).

32

Simply put, the new majority's grant of rehearing was unwarranted and improper because the original majority did not overlook any controlling statutes relative to whether SB 1 applies to an open class in thoroughly and sensibly applying the controlling *Woodall* test. Again, the issue of whether SB 1 applies to an open class was raised, considered, and decided on the original merits review, and the Board should not have been permitted through rehearing to relitigate or raise any new issues in this regard. *Johnson v. Commonwealth*, 450 S.W.3d 707, 713 (Ky. 2014).

## 2. The Original Majority Did Not Misconceive Applicable Law.

Second, the original majority did not misconceive the applicable law. Although the new majority claims the original majority failed to properly consider the reasonableness of the legislative classification under SB 1, a*nte*, at 6, 10, the original majority did not misconceive the law for the simple reason that the reasonableness of a legislative classification is not a component of the test for special legislation under *Woodall*. Candidly, to say otherwise is disingenuous, craftily ignoring, abandoning, and reversing *Woodall's* unmistakable holding rather than merely "expanding" upon the controlling precedent. *Ante*, at 10. Particularly, *Woodall* unequivocally overruled prior decisions such as *Schoo v. Rose*, 270 S.W.2d 940, 941 (Ky. 1954), and *Tabler*, 704 S.W.2d at 186, which had relied upon the reasonableness of the legislative classification to determine the validity of statutes under Sections 59 and 60.

Tellingly, the new majority opinion begins its analysis by applying the same *Woodall* test as the original majority to seemingly arrive at a different

33

conclusion, stating, "[h]ere, SB 1 applies only to the Jefferson County school district and therefore *may* not pass this test." *Ante*, at 8 (emphasis added). However, the new majority offers scant, if any, analysis to support this uncertain assertion and otherwise fails to address or distinguish the longstanding legal authority in support of the original majority's contrary holding.

Having thus failed to establish any legal error relative to the original majority's application of the controlling *Woodall* decision, the new majority abruptly shifts to its primary position that "the reasonableness of the classification generally remains the appropriate standard for challenges to legislation under Sections 59 and 60 of the Kentucky Constitution." *Ante*, at 10. However, in claiming these standards "remain good law[,]" *ante*, at 6, the new majority conveniently overlooks the fact that *Woodall* explicitly rejected and abandoned the classification analysis under the Section 59 and 60 standard.

Indeed, the *Woodall* Court explicitly disavowed the judicial consideration of issues relative to the reasonableness of a legislative classification under Sections 59 and 60 and instead held:

> [F]or the sake of clarity going forward, state constitutional **challenges to legislation based on classification succeed or fail on the basis of equal protection analysis under Sections 1, 2, and 3 of the Kentucky Constitution.** As for analysis under Sections 59 and 60, the appropriate test is whether the statute applies to a particular individual, object or locale.

34

607 S.W.3d at 573 (emphasis added). Particularly, the *Woodall* Court explained the classification test employed by prior Kentucky precedents, including *Schoo* and decisions which relied upon *Schoo,* constituted a "flawed analysis" founded "on cases interpreting the federal Equal Protection clause or Section 3, **not** Section 59's prohibition on special legislation." *Id.* at 566, 571. Thus, *Woodall* restored "[t]he original test for a violation of Section 59's prohibition on special and local legislation" and held "'special legislation applies to particular places or persons as distinguished from classes of places or persons.'" *Id.* at 567 (quoting *Greene v. Caldwell,* 170 Ky. 571, 587, 186 S.W. 48, 654 (1916)).

Proponents of the new majority's view have previously acknowledged as much. A cursory review of Justice Keller's separate opinion in *Woodall* removes any doubt relative to the impact of *Woodall* upon prior precedent, particularly including the *Schoo* test. *Id.* at 574 (Keller, J., concurring in part, concurring in result only in part). After examining Section 59 jurisprudence, "specifically our application of the *Schoo* test versus the majority's new, 'original test[,[" her discerning separate concurrence observed:

> Today's majority takes the opportunity **to dismantle our long-standing test for special legislation** in a case where this significant change in the law has no effect on the outcome of the matter before us. More importantly, nearly two years ago, in *Zuckerman,* the majority rejected taking this step.

*Id.* at 574, 578 (Keller, J., concurring in part, concurring in result only in part) (emphasis added).

35

Similarly, Justice Bisig's original dissent in this appeal argued for "a **return** to the standards articulated in *Schoo* and *Tabler*" in part because "the test devised by the *Woodall* Court **to replace** the previous long-standing test for Section 59 challenges **removed** an important and necessary element of any test for impermissible special and local legislation, namely whether the legislation is based upon **unreasonable or arbitrary classification**." *Coleman*, 2024 WL 5180457, at *22, 29 (Bisig, J., dissenting) (emphasis added). Thus, it cannot be seriously disputed that *Woodall* overruled the *Schoo* test.

From the foregoing, it is evident that, in reviewing the constitutionality of SB 1, the original majority did not misconceive the applicable law by failing to consider the reasonableness of the classification because such analysis is not a relevant factor under the *Woodall* test. The new majority's claim that the classification analysis utilized by pre-*Woodall* decisions remained good law at the time of the original hearing in this appeal is simply unfounded and irreconcilable with previous declarations. Therefore, the grant of rehearing was improper.

**3. The Original Majority Discerned and Applied the Correct Laws and Legal Standards.**

Third, by applying *Woodall*, the original majority discerned and applied the correct laws and standards to this appeal. While the new majority has seized the present opportunity to change the law by effectively overruling *Woodall*, the dictates of Kentucky precedent necessarily refute any claim that

the original majority failed to discern and apply the correct legal standard at the time the original decision was rendered.

In its initial brief before the original majority, the Board rested its argument entirely on the proposition that SB 1 "violated the prohibitions against special legislation in Sections 59 and 60 of the Kentucky Constitution, based on the holding and reasoning in [*Woodall*]." Faced with the rejection of its arguments relative to the dictates of *Woodall* by the original majority opinion, however, the Board changed course and contradicted its prior position in its petition for rehearing by relying upon the original dissenting opinion, which had advocated a **change in the law**, presenting an alternative argument to "rescind" *Woodall* and return to the prior *Schoo* test.

Such a maneuver is clearly improper and should have been rejected because it is firmly established that:

> On application for a rehearing, a party is not entitled to make a contention contrary to a contention previously made by the party. **Where an appeal has been heard and determined on a certain theory, a rehearing cannot be had on grounds inconsistent with that theory**.

5 C.J.S. *Appeal and Error* § 805 (2025) (emphasis added) (footnotes omitted). The original majority properly heard and decided this appeal based on the applicable law which was specifically asserted and acknowledged by the parties. Thus, in petitioning for rehearing, the Board should have been held to its original position on the merits, and, in denying the Board's request, the new majority should have awaited a future case to reconsider the continuing validity of *Woodall.*

37

Because the Board's invitation to change the law by overruling *Woodall* necessarily refutes and contradicts any claim that the original majority misperceived or misapplied the current *applicable* law, the new majority has obscured the legal effect of its ruling today by pressing the rather incongruous and surrealistic, if not entirely disingenuous, claim that it has merely *expanded* upon *Woodall* by relying upon the rationale of pre-*Woodall* decisions to reinstate the very same classification test which *Woodall* expressly overruled and abandoned. *Ante*, at 10. Make no mistake, this is pure sophistry and semantic wordplay to conceal the fact that the new majority has effectively overruled *Woodall* sub silentio.

For example, the new majority cites the pre-*Woodall* decision in *Zuckerman v. Bevin*, 565 S.W.3d 580, 600 (Ky. 2018), as the so-called "leading view" to support its conclusion that the primary inquiry under Sections 59 and 60 involves the reasonableness of the legislative classification. *Id.* However, in purporting *Zuckerman* to typify the "leading view" on Section 59 jurisprudence, the new majority baldly misrepresents the true state of Kentucky law at the time of the original majority's decision.

Indisputably, *Zuckerman* relied upon the classification analysis set forth by *Schoo* and various other decisions which *Woodall* subsequently discarded and overruled as "flawed." *Compare Zuckerman*, 565 S.W.3d at 600 (applying two-part classification test under *Schoo*) with *Woodall*, 607 S.W.3d at 572 (departing "from more recent analysis of special legislation[.]"). Indeed, *Woodall* specifically characterized *Zuckerman* as purporting "to apply the *Schoo* test"

38

while further observing the *conclusion* of *Zuckerman*, as opposed to its *analysis* and *reasoning*, was "consistent with the original § 59 analysis." *Woodall*, 607 S.W.3d at 567 n.10.

The new majority's reliance on former Chief Justice Minton's separate concurrence in *Zuckerman* to support the use of a classification test under Section 59 is similarly misplaced because former Chief Justice Minton fully concurred with the subsequent *Woodall* decision. *Woodall*, 607 S.W.3d at 573. The evolution of former Chief Justice Minton's views on the proper analysis under Section 59 is clearly illustrated by *Cates v. Kroger*, 627 S.W.3d 864 (Ky. 2021), a post-*Woodall* decision authored by Chief Justice Minton.[12]

In *Cates*, the Court specifically refused to consider a classification argument under Sections 59 and 60. *Id.* at 872. Applying the *Woodall* test, the *Cates* Court confined its inquiry to the "**statutory text at issue**" and further observed the

> **argument that the statute differentiates** between older and younger workers **is a classification argument**, which is properly considered under sections 1, 2, and 3 of the Kentucky Constitution.

*Id.* (emphasis added). Thus, our decision in *Cates* definitively confirmed that the reasonableness of the legislative classification does not impact the test for special legislation under *Woodall*. *Id.*

---

[12] *Cates* involved two separate appeals which addressed identical issues and were heard together. 627 S.W.3d at 867. I concurred with the unanimous vote of the Court as to the first appeal, but dissented as to the disposition of the second appeal which I would have dismissed for failure to name an indispensable party. *Id.* at 876 (Nickell, J., concurring in part, dissenting in part).

By unduly elevating the status of the *Zuckerman* analysis while, at the same time, failing to address *Zuckerman's* analytical incompatibility with the more recent *Woodall* decision, the new majority flaunts the fundamental law of precedent which dictates that older decisions which are inconsistent with this Court's most recent pronouncement "must be considered as overruled." *Louisville & N. R. Co. v. Dunn*, 380 S.W.2d 241, 244 (Ky. 1964). Viewed in its proper legal context relative to the more recent *Woodall* decision, *Zuckerman* can hardly be said to represent the "leading view" on special legislation analysis under Kentucky law.

Thus, the new majority cannot fairly imply that the original majority failed to discern and apply the "correct laws and standards" to this appeal. It is one thing to critique the validity of *Woodall*, but quite another to fault the original majority for applying this Court's most recent precedent, especially where both parties had acknowledged that *Woodall* alone controlled the outcome of this dispute. By changing the law to reinstate the classification test that *Woodall* had explicitly overruled, the new majority has unwittingly demonstrated that the original majority did not commit any legal error to justify this rehearing.

Indeed, it is astonishing to consider that, according to the new majority, the decision of the original majority to follow the most recent precedent of this Court as set forth in *Woodall* essentially amounted to palpable error and manifest injustice. *See Deemer*, 817 S.W.2d at 438 (Wintersheimer, J., dissenting) (observing extraordinary cause for rehearing is akin to palpable

40

error review). I am profoundly disturbed by the damage and mischief such a brazen manipulation of the rehearing standard will inflict on the stability and integrity of our judicial decision-making process in the future.

### C. *Woodall* Should Not Be Overruled, Expanded, or Modified.

Compounding its error relative to the improvident grant of rehearing, the new majority's ill-advised and procedurally improper overruling of *Woodall* will only serve to exacerbate and perpetuate the constitutional and historical errors arising from the conflation of equal protection analysis with that of special legislation. I remain convinced *Woodall* was correctly decided on the law and stand by the original majority's decision on the merits of the present appeal. *Coleman*, 2024 WL 5180457 at *7.

One of the primary points of *Woodall* was to demonstrate "the illogic of applying the same test to separate provisions of the constitution which arose from different constitutional eras and are designed to address different problems." *Id.* at *9. Equally important to *Woodall's* holding was "the thought that our Court in more recent opinions had become too subjective in applying *Schoo* and the court's inconsistent defining of whatever the classification might entail." *Id.* at *18 (VanMeter, C.J., concurring).

Additionally, the dubious constitutional and historical pedigree of the *Schoo* test was exhaustively debated in both *Woodall* and the original decision in this appeal. While there is no need to rehash these extended arguments here, I would briefly note the readily apparent flaws in the reasoning of *Schoo* amply justified its rejection by *Woodall*. 607 S.W.3d at 567.

41

In particular, the *Schoo* test, effectively restored by the new majority today, traces its lineage to *Safety Building Loan Co. v. Ecklar*, 50 S.W. 50 (Ky. 1899).[13]  However, *Ecklar* was overruled in part by *Linton v. Fulton Bldg. & Loan Ass'n*, 262 Ky. 198, 90 S.W.2d 22, 25 (1936), because "the distinction between class legislation, special or local and general law was not at that time generally observed by this and courts of other jurisdictions."  This is precisely the same distinction which *Woodall* recognized in reliance upon other Founding Era decisions such as *Stone*, 39 S.W. at 50 (1897), and *Commonwealth v. E. H. Taylor, Jr. Co.*, 101 Ky. 325, 41 S.W. 11, 15 (1897), when it overruled *Schoo*. *Woodall*, 607 S.W.3d at 567.  Additionally, *Ecklar* was poorly reasoned because it did not take account of any pre-existing Section 59 jurisprudence, such as the earlier decision in *Long*, 30 S.W. at 990-91, and proclaimed its classification test by judicial fiat.  *Ecklar*, 50 S.W. at 51.

Similarly, *Schoo* rested on faulty grounds because it did not take any notice of the fact that *Ecklar* had been overruled by *Linton* or otherwise explain the relevance of its citations to decisions based on the Equal Protection Clause of the 14th Amendment to the United States Constitution.  *See Coleman*, 2024 WL 5180457, at *12 (VanMeter, C.J., concurring).  Moreover, the unsound and

---

[13] *Ecklar* was the oldest decision *Schoo* relied upon to support its test for special legislation under Section 59.   However, *Schoo* cited other decisions which either relied on *Ecklar*, such as *Droege v. McInerney*, 120 Ky. 796, 87 S.W. 1085 (1905), or otherwise relied on other constitutional provisions, such as *Burrow v. Kapfhammer*, 284 Ky. 753, 145 S.W.2d 1067 (1940) (applying Sections 1 of the Kentucky Constitution and the 14th Amendment to the United States Constitution), and *Terrace v. Thompson*, 263 U.S. 197 (1923) (applying equal protection analysis under 14th Amendment), and *Truax v. Corrigan*, 257 U.S. 312 (1921) (same).  *See Coleman*, 2024 WL 5180457, at *12 (VanMeter, C.J., concurring).

incorrect analysis utilized by *Schoo* and its progeny, including *Tabler*, "resulted in an intolerable uncertainty in the law." *Coleman*, 2024 WL 5180457, at *9 (quoting *Woodall*, 607 S.W.3d at 568-69).

Specifically, *Woodall* overruled *Tabler* and criticized that decision "for 'super-charging' *Schoo's* flawed analysis" and imposing a heightened standard under Section 59. 607 S.W.3d at 571. *Woodall* further observed that Kentucky decisions interpreting Section 59 under *Schoo* and *Tabler* continued to be unpredictable and subjective because "[n]o one knows or can possibly know when a given statute will strike any judge, or four justices of this court, as worthy of the heightened standard." *Coleman*, 2024 WL 5180457, at *9 (quoting *Woodall*, 607 S.W.3d at 568-69.).

Although the new majority claims to have offset this undesirable effect by "agree[ing] with *Woodall's* critiques of *Tabler*" relative to the burden of proof on challenges under Section 59, *ante*, at 12, it is ultimately "the *Schoo* test [which] . . . proves to be untenable" and remains ripe for manipulation and abuse because there are multiple ways to resolve the question of whether a legislative classification is supported by distinctive and natural reasons. *Zuckerman*, 565 S.W.3d at 605-06 (Minton, C.J., concurring). In other words, "the classification-based approach preferred by" the new majority, which focuses on a determination of reasonableness is more predisposed "to judicial overreach and 'involve[s] multiple inquiries that are difficult for the judiciary to perform and perform on a consistent basis.'" *Coleman*, 2024 WL 5180457, at *10

43

(quoting Anthony Schutz, *State Constitutional Restrictions on Special Legislation as Structural Restraints*, 40 J. Legis. 39, 95 (2013)).

By contrast, *Woodall* set forth a simple, predictable test based on a close reading of "the text, the history, and . . . role" of Sections 59 and 60 "in the overall constitutional scheme[.]" *Coleman*, 2024 WL 5180457 at *20 (VanMeter, C.J., concurring). By overruling the *Schoo* test, *Woodall* ensured that interested parties no longer "need to wonder how this court will rule on a Section 59/60 challenge; rather, they need only apply the straightforward, relatively objective analysis set forth in *Woodall* to know whether a provision can withstand constitutional muster." *Id.* (VanMeter, C.J., concurring). Further, as former Chief Justice VanMeter cogently explained:

> *Woodall* is not the death-knell for equal protection in this Commonwealth. Our equal protection jurisprudence is alive and well under Sections 1, 2, and 3. The court does not need to perpetuate the conflation of special/local legislation with equal protection in order to continue to protect the rights of Kentucky citizens. When a case before this court properly asserts an equal protection challenge, *Woodall* does nothing to impede that analysis; the *Woodall* analysis only clarifies the separate matter, under Sections 59 and 60, of whether the legislature has improperly drafted legislation which applies "exclusively to particular places or particular persons." 607 S.W.3d at 572. To subsume that interpretation into the much broader concept of equal protection enshrined in Sections 1, 2, and 3 would be the true death of Sections 59 and 60.

*Id.* (VanMeter, C.J., concurring). For these reasons, the *Woodall* approach is demonstrably preferable to the *Schoo* test as a matter of sound constitutional interpretation and should not be overruled, expanded, or modified. It should be followed.

**D. SB 1 Is Supported by Natural and Reasonable Distinctions.**

In addition, and without conceding the validity of the new majority's reformulated *Schoo* test, I would nevertheless hold SB 1 is based on a reasonable legislative classification. While I maintain the *Woodall* test sets forth the appropriate legal standard, I further conclude SB 1 passes constitutional muster even under the new majority's imprudent, resurrected *Schoo* test as well.

At the outset, I reject the new majority's premise that the legislative classification under SB 1 is solely based upon the form of government. *See ante*, at 13. Instead, the pertinent classification is a function of both city and county *population* in connection with voter choice as to the form of local government.

SB 1 applies to "a county school district in a county with a consolidated local government adopted under KRS Chapter 67C[.]" KRS 160.370(2). KRS 67C.101(1) authorizes "any city of the first class" to consolidate its government with that of the county "upon approval by the voters of the county at a regular or special election[.]" KRS 81.005(1)(a) defines a city of the first class to "include cities organized and operating under the mayor-alderman plan of government in accordance with KRS Chapter 83." The mayor-alderman plan of government is set forth in KRS 83.410 to 83.660 and was specifically designed to empower first-class cities to effectively respond to "urban crisis." KRS 83.410. Further, KRS 83A.160(6) expressly limits the adoption of the mayor-alderman plan to "[a]ny city with the largest population located in a county

45

with a population equal to or greater than two hundred fifty thousand (250,000)[.]" Thus, by its plain terms, the application of SB 1 is necessarily limited to counties with both a city of the first-class and a population of over 250,000.[14]

"When considering the constitutionality of any statute, this Court must draw all reasonable inferences and implications from the act as a whole, and thereby, if possible, sustain its validity." *Kentucky Indus. Utility Customers, Inc. v. Kentucky Utilities Co.*, 983 S.W.2d 493, 499 (Ky. 1998). In other words, "the violation of the Constitution must be clear, complete and unmistakable in order to find the law unconstitutional." *Id.*

Moreover, to properly contextualize an inquiry into the legislative classifications relative to a common school district, a reviewing court should remain mindful that

> [t]he common school district is a creature of the statute, and, what the Legislature made, it may unmake. The people within a common school district cannot demand that it shall remain unchanged, and what change shall be made rests wholly with the Legislature.

---

[14] Fayette County is a unique case which does not fit neatly within the current classification scheme under KRS 81.005. Prior to the enactment of the current city classification system, Lexington and Fayette County merged to form Kentucky's only urban-county government under KRS Chapter 67A. Legislative Research Comm'n, Informational Bulletin No. 115, *County Government in Kentucky* at pg. 114 (2025). "At that time, Lexington was a city of the second class, as designated under the classification system then in use." *Id.* Indeed, the choice to form an urban county government is available to "the voters in any county **except a county containing a city of the first class**[.] KRS 67A.010 (emphasis added). Under the new classification system, Lexington was permitted to retain the existing benefits of the urban-county merger and is now classified as a home rule city under KRS 81.005(1)(b)2 because it operates under the "[m]ayor-council plan of government in accordance with KRS 83A.130." Thus, the Lexington is not a city of the first class and currently falls outside the scope of SB 1.

*Elliott v. Garner*, 140 Ky. 157, 130 S.W. 997, 998 (1910). Additionally,

Kentucky precedent has long recognized the subject of public education

"requires different provisions for localities differing in density of population."

*City of Louisville v. Commonwealth*, 134 Ky. 488, 121 S.W. 411, 412 (1909).

In *City of Louisville*, 121 S.W. at 413, our predecessor Court rejected a

Section 59 challenge to a statute which set a minimum levy of school taxes and

applied only to Louisville. The Court explained:

> Classification is a necessary feature and power of legislation, as it is impossible for any extensive code of laws to apply to every person or subject in the state. The Constitution itself provides for the classification of the cities and towns of the commonwealth. **That fact alone establishes such classification as reasonable as to matters susceptible of treatment upon the basis of density and extent of population.** The fact that only one city now belongs to the first class detracts nothing from the propriety of such allotment. Indeed, when the Constitution was adopted, but one city could possibly have been included in the first class under the requirement as to population fixed by the Constitution—a fact known to the convention. Time and again this court has declared that subjects susceptible of classification according to population might be classified so as to apply only to cities of the first class, notwithstanding there was but one such[.]

*Id.* (emphasis added).

Undoubtedly, other Kentucky school districts, both county and

independent, large and small, could have benefited from increased funding

through a minimum levy of school taxes. Yet, the legislature identified a

problem unique to cities of the first class and deemed it necessary, reasonable,

and appropriate to tailor a solution to that problem. *Id.* Our predecessor

47

Court specifically held the drawing of such a classification based on population did not violate Section 59. *Id.*

The reasoning of *City of Louisville* applies equally here because SB 1 similarly applies to cities of the first class. By definition, SB 1 only applies to counties with a city of a first class because only cities of the first class are authorized to consolidate with county government under KRS Chapter 67C. In turn, a city of the first class must necessarily be the largest city by population in a county with a population of at least 250,000. In *City of Louisville*, our predecessor Court upheld a similar classification based on population and SB 1 should not be treated any differently in this regard. *Id.*

The new majority claims to lack any insight into why the provisions of SB 1 should not be applied to smaller counties and independent school districts. *Ante*, at 14. An examination of Kentucky precedents under Section 59 provide sufficient clarity because these decisions have invariably recognized a natural and reasonable distinction between high population urban counties and low population rural counties. *Metcalf v. Howard*, 304 Ky. 498, 201 S.W.2d 197, 201 (1947). In other words, "[w]hat is suitable for Jefferson County, with 400,000 inhabitants, principally urban, is not suitable for Robertson County, with a population of 3,500, which is wholly rural." *Id.* Moreover, "[t]he failure to recognize this status has proved to be an obstacle to much reasonable and salutary legislation." *Id.*

The same logic relates to independent school districts which are limited to "designated cities" with at least 200 students as opposed to the consolidated

48

local government under KRS Chapter 67C which is limited to the largest city by population in a county with a population of at least 250,000. For example, Jefferson County Public Schools is the largest school district in Kentucky and serves over 95,000 students while Covington Independent Public Schools, Kentucky's largest independent district, serves approximately 3,800 students.[15]

Similarly, in *Bd. of Ed. of Louisville v. Bd. of Ed. of Jefferson Cnty*, 522 S.W.2d 854, 855-56 (Ky. 1975), our predecessor Court rejected a Section 59 challenge to "certain statutes making special provisions for such structuring where an independent school district embracing a city of the first class (of which Louisville is the only one) merges with the county school district of the county containing that city." Pertinent to the present appeal, the statutes in question provided for a permanent 7-member board of education where an independent school district, containing a city of the first class, merged with the county district while other merged districts across Kentucky were allotted a permanent 5-member board. *Id.* at 856.

Ultimately, the Court determined the size and population of Louisville as a first-class city justified the differential treatment relative to management structure of the board explaining:

> The statutes with which we are concerned in the instant case deal directly with the management structure of the merged school district, as to which subject we think the characteristics possessed by a large urban center of population have relevancy. **The larger size of the student**

[15] *See* www.covington.kyschools.us/page/choose-our-district (last accessed September 26, 2025).

**population, the greater amount of property to manage, and the more extensive financing requirements are significant factors.** Another factor serving as a supporting basis for the classification is that in large urban centers there are likely to be and generally are localized enclaves or areas populated almost exclusively by various minority groups, ethnic and otherwise, which are entitled to and should be assured of fair representation, and are specially needful of it. This legislation obviously is directed to and justified by that particular circumstance. By providing for seven board members rather than five it assures such representation and tends to eliminate what probably would be a major source of disagreement in merger negotiations. The principle of judicial notice permits us to recognize, as common sense equally forbids us to ignore, these facts of life. Thus it is our opinion that the statutory provisions for an ultimate seven-man board are valid.

*Id.* at 857 (emphasis added).

The reasoning of this decision applies with equal force to the present appeal. Undoubtedly, other Kentucky counties, urban and rural, large and small, could have benefited from the inclusion of additional and underrepresented voices at the decision-making table. However, because Jefferson County must contend with "[t]he larger size of the student population, the greater amount of property to manage, and the more extensive financing requirements," these factors permitted a classification based on population under Section 59. *Id.* The same concerns are equally germane to SB 1.

By refusing to apply the reasoning of *Bd. of Ed. of Louisville* to SB 1, the new majority mischaracterizes the nature of the legislative classification. In my view, SB 1 responds, not simply to the existence of problems equally shouldered by all Kentucky counties alike, but rather to the degree by which

50

the population of Jefferson County magnifies and complicates the management of such issues.

Additionally, the new majority's conclusory assertion that school-related issues such as "student performance, student discipline, dropout rates, and busing[,]" *ante*, at 16, are not "unique to Jefferson County or a product solely of its unique large urban environment[,]" *id.*, does not withstand scrutiny. Legal and educational scholars have long recognized the unique problems facing urban school districts. Michael Heise, *Litigated Learning & the Limits of the Law*, 57 Vand. L. Rev. 2417 (2004).

For example, the issues of student performance, student discipline, and the dropout rate are undoubtedly impacted by the size and population of Jefferson County, which operates 168 schools with 7,000 teachers to oversee more than 95,000 students who speak over 139 different languages.[16] Professor Michael Heise generally described the experience of a large urban school district as follows:

> Low student achievement is only one of the ills that plague numerous urban districts. Dropout rates in high-poverty schools usually exceed rates in low-poverty schools. Problems also persist for those students who remain in these high-poverty, urban institutions. Urban public school teachers report spending more time on classroom discipline than their nonurban counterparts, as well as having more problems relating to student absenteeism, pregnancy, and weapons possession. Finally, those students who manage to graduate from high-poverty urban schools are less likely to attend college than those who graduate from low-poverty schools.

*Id.* at 2423-24 (footnotes omitted).

---

[16] https://www.jefferson.kyschools.us/ (last visited September 26, 2025).

Similarly, the Commonwealth noted that over 60,000 students ride the bus in Jefferson County. This figure dwarfs the median Kentucky population by county which stands at approximately 19,686.[17] Only 16 out of the 120 Kentucky counties have a total population over 60,000 (Boone, Bullitt, Campbell, Christian, Daviess, Fayette, Hardin, Jefferson, Kenton, Laurel, McCracken, Madison, Oldham, Pulaski, Scott, and Warren) while the majority of counties has a total population of less than 25,000 including Kentucky's ten least populated counties, each counting a total population less than 7,500 (Carlisle, Cumberland, Elliott, Fulton, Hickman, Lee, Menifee, Owsley, Robertson, and Wolfe).[18] Surely, the new majority does not seriously contend the problem of busing is the same in Jefferson County as it is across the Commonwealth.

Relative to the present appeal, SB 1 was not enacted in a vacuum. In 2018, public concern about the ability of the Board to effectively meet the specific academic and logistical challenges faced by the district culminated in a settlement between the Board and the Kentucky Board of Education which imposed a corrective action plan to avoid a complete state takeover. Although the Board was released from the terms of the corrective action plan in 2020, public concerns remained. SB 1 was subsequently enacted in 2022.

---

[17] https://kaco.org/articles/kentucky-county-population-trends-in-2023/ (last visited September 26, 2025).

[18] U.S. Census Bureau, Population Division, Annual Estimates of the Resident Population for Counties in Kentucky: April 1, 2020 to July 1, 2024 (CO-EST2024-POP-21) (March 2025).

If the population of Louisville as a first-class city alone warranted the imposition of a minimum school tax to the exclusion of the rest of Kentucky as in *City of Louisville*, 121 S.W. at 413, and a different school board management structure relative to the rest of Kentucky as in *Bd. of Ed. of Louisville*, 522 S.W.2d at 857, then I submit the size and population of Louisville likewise warrants the different management structure the legislature has seen fit to impose in the present appeal. While the new majority may doubt the wisdom and even the constitutionality of SB 1, "it is not a court's province to pass on the wisdom of a legislative act, and mere doubt as to its constitutionality must be resolved in favor of the legislature." *Bd. of Ed. of Jefferson Cnty. v. Bd. of Ed. of Louisville*, 472 S.W.2d 496, 501 (Ky. 1971) (Palmore, J., dissenting).

In my view, the legislative classification under SB 1 is clearly reasonable and otherwise supported by Kentucky precedent. Therefore, I would reject the Board's challenge under Sections 59 and 60.

## CONCLUSION

In my estimation, the grant of rehearing by the new majority in this matter will be undoubtedly perceived "as a result-oriented outlier." *Cates*, 627 S.W.3d at 877 (Nickell, J., concurring in part, dissenting in part). The new majority has plainly failed to establish that the original majority committed any error of law or fact sufficient to justify the grant of rehearing under RAP 43(B)(1)(a).

Appellate judges or justices devoted to the rule of law will often dissent, in whole or in part, from a majority appellate opinion, only to thereafter

recommend denial of a subsequent petition for rehearing which fails to meet the rigorous legal standard under our appellate procedural rules. This is so because judicial decisions should be based solely upon an appellate judge's or justice's studied understanding and impartial application of constitutional provisions, legislative statutes, executive regulations, legal precedent, procedural rules, and other guiding legal authority, none of which may reflect their personal perspectives or political preferences. The appellate judge's or justice's focus must be targeted upon resolving particular legal disputes based on the law and the facts as presented, resisting personal preference, political pressure, or special interest influence.

Some may attempt to excuse the reconstituted majority's result-driven upending of our well-established procedural rules to grant an erroneous rehearing of an entirely procedurally sound and wholly judicially considered opinion of this Court upon glib political maxims, such as "elections have consequences." However, such excuses conveniently ignore that, within our government's three-branched framework, stated broadly, legislative bodies are elected to enact laws aimed at pursuing chosen public policy goals and executive officers are elected to execute and enforce enacted laws to administer and achieve adopted public policy objectives, while judicial courts—however chosen—are restricted to interpreting and administering enacted laws and determining their constitutional legitimacy absent review concerning the wisdom or correctness of underlying public policy. As a result, the American legal tradition has long recognized that legislators and executive officers are

54

ultimately accountable to the people while judges and justices are ultimately accountable to the law.

Simply put, "[j]udges are not politicians, even when they come to the bench by way of the ballot." 48A C.J.S. *Judges* § 26 (2025). The fundamental guarantee of an independent judiciary requires

> judges [to] perform a function fundamentally different from that of the people's elected representatives. Legislative and executive officials act on behalf of the voters who placed them in office; "judge[s] represen[t] the Law." *Chisom v. Roemer*, 501 U.S. 380, 411, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (SCALIA, J., dissenting). Unlike their counterparts in the political branches, judges are expected to refrain from catering to particular constituencies or committing themselves on controversial issues in advance of adversarial presentation.

*Republican Party of Minnesota v. White*, 536 U.S. 765, 803-04 (2002) (Ginsburg, J., dissenting). Thus, courts must be free of political machinations and any fortuitous change in the composition of an appellate court's justices should have no impact upon previously rendered fair and impartial judicial pronouncements.

> A basic change in the law upon a ground no firmer than a change in our membership invites the popular misconception that this institution is little different from the two political branches of the Government. No misconception could do more lasting injury to this Court and to the system of law which it is our abiding mission to serve.

*Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 636 (1974) (Potter, J., dissenting). Most certainly, "[a]s an institution cloaked with public legitimacy, a state's supreme court cannot recede from its own controlling precedent when the only

55

change has been the membership of the court."  20 Am. Jur. 2d *Courts* § 134 (2025).

The unmistakable impropriety of this rehearing is confirmed by the fact that the new majority changed the law to support its holding by effectively overruling *Woodall*, despite the Board's sole reliance upon *Woodall* upon the original merits review.  Moreover, I fear the new majority's ill-advised and procedurally improper retreat from *Woodall* will unduly hamper the ability of the General Assembly to enact salutary legislation by subjecting the review of statutes under Sections 59 and 60 to the same morass of unpredictable and unfettered judicial discretion which the *Woodall* Court deemed "to be unworthy of any legal system."  607 S.W.3d at 569.  Therefore, I dissent.

Lambert, C.J.; and Conley, J., join.


COUNSEL FOR APPELLANT, RUSSELL M. COLEMAN,
IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL
OF THE COMMONWEALTH OF KENTUCKY:

Russell M. Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Solicitor General

Jacob M. Abrahamson
Assistant Solicitor General

COUNSEL FOR APPELLEE,
JEFFERSON COUNTY BOARD OF EDUCATION:

David Tachau
Katherine Lacy Crosby
Amy D. Cubbage
Tachau Meek PLC

COUNSEL FOR APPELLEE,
ROBBIE FLETCHER, COMMISSIONER OF KENTUCKY
DEPARTMENT OF EDUCATION:

Corey Nichols
Kentucky Department of Education

COUNSEL FOR AMICUS CURIAE,
IMPETUS FOR A BETTER LOUISVILLE AND
GREATER LOUISVILLE, INC.:

Bethany A. Breetz
Michael D. Risley
Kyle Seth Schroader
Stites & Harbison, PLLC

COUNSEL FOR AMICUS CURIAE,
NICKLIES FOUNDATION, INC:

Benjamin Cadden Fultz
Fultz Maddox Dickens PLC


COUNSEL FOR AMICUS CURIAE,
ROBERT STIVERS, PRESIDENT OF THE
SENATE OF KENTUCKY:

David Fleenor
General Counsel
Office of Senate President

Sheryl Glenn Snyder
Frost Brown Todd LLP


COUNSEL FOR AMICUS CURIAE,
DAVID OSBORNE, SPEAKER OF THE KENTUCKY
HOUSE OF REPRESENTATIVES:

D. Eric Lycan
Joseph A. Bilby
Office of the Speaker